13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FINJAN, INC.,                    )
                                 )
            Plaintiffs,          )
                                 ) C.A. No. 18-1519-MN
v.                               )
                                 )
RAPID7, INC., et al.,            )
                                 )
            Defendants.          )


                        Wednesday, January 15, 2020
                        9:00 a.m.
                        Claim Construction Hearing


                        844 King Street
                        Wilmington, Delaware


BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge



APPEARANCES:


          POTTER ANDERSON & CORROON, LLP
          BY:  PHILIP A. ROVNER, ESQ.

          -and-

          KRAMER LEVIN NAFTALIS & FRANKEL
          BY:  PAULA A. ANDRE, ESQ.
          BY:  JAMES HANNAH, ESQ.
          BY:  AARON M. FRANKEL, ESQ.


                    Counsel for the Plaintiff

1    APPEARANCES CONTINUED:

2

3

                 DUANE MORRIS LLP
4                BY:  RICHARD L. RENCK, ESQ.
                 BY:  MATTHEW C. GAUDET, ESQ.
5                BY:  DAVID C. DOTSON, ESQ.

6

                            Counsel for the Defendants
7

8

9

10                         - oOo -

11                P R O C E E D I N G S

12           (REPORTER'S NOTE:  The following hearing was held in

13    open court, beginning at 9:00 a.m.)

14

08:45:14 15

08:49:03 16           THE COURT:  Good morning.  Please be seated.

09:01:01 17           All right.  Why don't we start with

09:01:03 18    introductions.

09:01:04 19           MR. ROVNER:  Good morning, Your Honor.  Phil

09:01:02 20    Rovner from Potter Anderson & Corroon on behalf of

09:01:11 21    plaintiff, Finjan.  And with me from Kramer Levin are Paul

09:01:15 22    Andre, James Hannah, and Aaron Frankel.

09:01:18 23           THE COURT:  Good morning.

09:01:24 24           MR. RENCK:  Good morning, Your Honor.

09:01:25 25           THE COURT:  Long time no see.

09:01:27  1          MR. RENCK:  It's been a few days I guess.

09:01:30  2  Richard Renck from Duane Morris on behalf of defendant,

09:01:33  3  Rapid7.  I also have at counsel table with me my colleagues,

09:01:38  4  Matthew Gaudet and David Dotson.  We also have a client

09:01:41  5  representative from Rapid7, Mr. Eshman.

09:01:44  6          THE COURT:  Welcome, all of you.  Just give me

09:01:47  7  one minute to pull out my notes.

09:01:54  8          Okay.  I think it would be helpful to me if

09:02:00  9  could go through term by term, though I think there may be a

09:02:04 10  few terms we can group.  If you all plan to do that, that's

09:02:07 11  fine, but for the most part if we take them term by term so

09:02:12 12  I can focus on each one, that would be most helpful.

09:02:15 13          Okay.  Mr. Andre.

09:02:20 14          MR. ANDRE:  Thank you, Your Honor.  May it

09:02:22 15  please the Court, what we're going to do today and we have a

09:02:26 16  little bit of a time issue, I know today we have four

09:02:32 17  patents we are going to talk about; next week we have two

09:02:35 18  other patents.  Two of the patents here are grouped together

09:02:37 19  with the three terms, that's what I'll be dealing with.  And

09:02:40 20  Mr. Hannah will take the next patent.  And Mr. Frankel will

09:02:45 21  take the next one.

09:02:47 22          THE COURT:  Okay.

09:02:48 23          MR. ANDRE:  As Your Honor is aware of in this

09:02:49 24  case there are seven patents, overlapping technologies,

09:02:52 25  patents, Finjan patents actually give a suite of security

09:02:57 1  protections and they approach security a bit differently one

09:03:02 2  from the other.  So as we go through the constructions,

09:03:06 3  you'll see how they relate to a particular type of security

09:03:10 4  and why they're needed.  And, therefore, that kind of forms

09:03:15 5  the construction.

09:03:15 6          Of the seven patents that are in this case, six

09:03:20 7  of them have terms that are in dispute.  One is -- one is

09:03:27 8  agreed upon terms so we won't be addressing that.  And there

09:03:30 9  were a handful of agreed upon terms.  The one that is

09:03:34 10  probably the most relevant to today's discussion is

09:03:37 11  downloadable.  I'll get to that in short order.

09:03:40 12          The terms that we're going to discuss today as I

09:03:43 13  said from the '494 and '086 patent will be three terms.

09:03:48 14  '154 has three terms.  The '918 has three terms.  And we'll

09:03:52 15  be -- I'll be discussing the first three of those terms.

09:03:55 16  The terms for next week from the '305 and '408 patent, I

09:03:59 17  think there are ten or eleven terms there, we'll discuss

09:04:02 18  those next week.  We'll not be addressing those today.

09:04:05 19          I want to talk a little bit about claim

09:04:10 20  construction themes.  A lot of judges who don't have

09:04:12 21  experience with patents don't quite understand that

09:04:16 22  constructions are only -- terms are only given special

09:04:20 23  constructions if it's given in the specification with the

09:04:23 24  patentee being a lexicographer or if there is something in

09:04:28 25  the prosecution history that's an express disavowal.

09:04:32  1    Ordinary meaning should apply.  I believe the Court is
09:04:35  2    probably very familiar with that, the number of patent cases
09:04:38  3    you have done in your life.
09:04:39  4            And the way Finjan approaches this, we have had
09:04:44  5    several litigations on these family of patents going back to
09:04:48  6    this court or Delaware court, going back to 2005-2006 time
09:04:52  7    period, so over the past fourteen, fifteen years, Finjan's
09:04:58  8    patents have been interpreted by no less than seven judges,
09:05:02  9    numerous PTAB's, I think we're almost at a hundred IPR
09:05:07 10    petitions if you can imagine that, and these patents have
09:05:11 11    survived all the IPR's, so we have faced many constructions
09:05:14 12    from many different defendants --
09:05:17 13            THE COURT:  I have read many of those.
09:05:19 14            MR. ANDRE:  I would imagine you have.
09:05:21 15            One thing that we, Finjan, have to do because we
09:05:26 16    can't tailor our constructions towards any given defendant
09:05:28 17    or even for validity or infringement, we try to be
09:05:31 18    consistent with our positions.  So what we have done
09:05:34 19    throughout the PTAB and through the district courts is to
09:05:37 20    give the same substantive construction for the term over and
09:05:41 21    over and over again.  There are times we'll try to agree
09:05:45 22    with other the side and try to find a middle ground and the
09:05:49 23    constructions will be slightly varied, but not in substance.
09:05:52 24    We always stay true to our constructions.  And those
09:05:56 25    constructions are based on the intrinsic record.  We don't

09:06:00 1    go outside the intrinsic record.  We don't think you need to

09:06:04 2    for these claims.

09:06:05 3          Rapid7 proposes constructions in this case that

09:06:11 4    are really just construction for construction sake.  They

09:06:13 5    never explain why a term will need to be construed.  We'll

09:06:17 6    discuss that with the very first term I talk about.  The

09:06:20 7    terms that they construe are not consistent with the

09:06:24 8    intrinsic record and they actually read out certain

09:06:29 9    preferred embodiments or embodiments from the specification.

09:06:35 10         So with that, I will get into the first set of

09:06:38 11   terms from the '494 and the '086 patents.  The first term is

09:06:44 12   downloadable scanner.  I know that earlier that downloadable

09:06:47 13   has been agreed to on the construction, so downloadable has

09:06:51 14   been construed.  So really what they're asking you to do is

09:06:55 15   construe scanner.

09:06:57 16         We said that those skilled in the art would

09:07:01 17   understand what a scanner is.  It's a pretty common term in

09:07:06 18   this field.  There is nothing in the specification that says

09:07:09 19   a scanner is this and limits it to a very specific type of

09:07:14 20   scanner.  There is nothing in the prosecution history that

09:07:16 21   does that.  Rapid7 gives an example, one of our preferred

09:07:22 22   embodiments as a type of scanner and their construction is

09:07:26 23   one type of scanner, but there are other types of scanners

09:07:29 24   as well.

09:07:30 25         THE COURT:  Why don't we get to -- what about

09:07:32  1    the Federal Circuit, what does the Federal Circuit say?

09:07:36  2            MR. ANDRE:  So the Federal Circuit in the

09:07:38  3    background construction, this terms --

09:07:40  4            THE COURT:  But they are used to the

09:07:43  5    construction, they stated this is what downloadable scanner

09:07:46  6    is, they called it a coding scanner, and they used that in

09:07:50  7    affirming the PTAB in the prior -- in overcoming prior art.

09:07:56  8    Why isn't that relevant?  You keep saying it's in the

09:07:59  9    background, it's in the background, and I understand the

09:08:02 10    Federal Circuit didn't go through a full claim construction

09:08:06 11    analysis laying out their foundation, but they did use that

09:08:10 12    construction, so why should I vary from it?

09:08:13 13            MR. ANDRE:  Well, because it wasn't first of all

09:08:15 14    argued to the Federal Circuit on claim construction, it's

09:08:18 15    not binding on this Court --

09:08:20 16            THE COURT:  But it seems odd to me, doesn't it,

09:08:22 17    that you would then get a claim construction, the Federal

09:08:25 18    Circuit using that claim construction plus your claims over

09:08:29 19    the prior art, you would presumably say that prior art has

09:08:33 20    now already been through the Patent Office, but now you want

09:08:35 21    me to give you a different claim construction.

09:08:37 22            MR. ANDRE:  Well, what the Federal Circuit --

09:08:39 23    the Federal Circuit gave an embodiment of a scanner, and

09:08:42 24    that is an embodiment disclosed in the specification.  Now

09:08:45 25    our scanner does cover that embodiment and that does get

09:08:49 1  over the prior art.  There wasn't a limitation that the

09:08:52 2  Federal Circuit put in or anyone put in to get over the

09:08:54 3  prior art, so that's how I would argue that position.

09:08:58 4         There has been no Federal Circuit opinion in

09:09:01 5  which we had an opportunity to debate what the downloadable

09:09:05 6  scanner is.  The Federal Circuit in many instances we have

09:09:08 7  had, Finjan has, I think four Federal Circuit cases, and I

09:09:13 8  raised this issue with one of the other courts.  I said

09:09:17 9  well, the Federal Circuit talked about the -- an embodiment

09:09:21 10 in our claims and so therefore, we're entitled to that

09:09:25 11 embodiment.  And the District Court said no, you're not

09:09:28 12 entitled to that because the other side did not have a

09:09:31 13 chance to go through a full claim construction briefing.

09:09:37 14         THE COURT:  Did the PTAB construe that term?

09:09:40 15         MR. ANDRE:  They did.  And the PTAB -- I believe

09:10:00 16 I misspoke.  I don't believe the PTAB has construed this

09:10:03 17 term.  PTAB construed another term a little further down.

09:10:13 18 So the only courts that have construed this is the *Cisco*

09:10:17 19 case.  And Judge Freeman construed this term, and gave it a

09:10:22 20 construction that's closer to what we've proposed.  And

09:10:25 21 there, the same counsel that's representing Rapid7 argued

09:10:29 22 for this exact same claim construction.  And Judge Freeman

09:10:32 23 denied that construction.

09:10:33 24         And in *Blue Coat II*, Rapid7 makes the argument

09:10:35 25 that under the *Blue Coat II*, Judge Freeman also looking at a

09:10:46  1   101 motion, and in that motion she talks about we're looking

09:10:50  2   at the downloadable, the downloadable security DSP.

09:10:55  3            And in fact, a related patent, the '844 patent

09:10:59  4   has a Federal Circuit opinion on the 101 on these issues

09:11:02  5   where the Federal Circuit said what is not abstract, not

09:11:07  6   Step 2, but Step 1, was downloadable security profile.  So

09:11:11  7   the focus here is not on the scanner, but on the DSP.  The

09:11:18  8   downloadable security profile.

09:11:24  9            So one of the reasons that this construction

09:11:26  10  also is not applicable, if you read the actual downloadable

09:11:32  11  scanner in context with the claims, it's a downloadable

09:11:38  12  scanner coupled with receiver for deriving security profile

09:11:42  13  data for the downloadable.  That's the DSP that we've talked

09:11:45  14  about.  Including a list of suspicious operations.

09:11:49  15            If you were to go to Rapid7's proposed

09:11:54  16  construction, there are examples of the downloadable scanner

09:12:00  17  coupled to receiver for deriving a security profile from

09:12:04  18  downloadables where the downloadables are either scripting

09:12:11  19  language or machine code.  Now typically that's not used --

09:12:14  20            THE COURT:  You say that in your papers that

09:12:17  21  there are these other issues and claims, there are things

09:12:21  22  mentioned, machine code, it's not typically, doesn't fall

09:12:25  23  within their, you know, conventional parsing technique.  How

09:12:32  24  am I supposed to know that?  Do you have any support for

09:12:36  25  that or it's just attorney argument and you want me to

believe it?

MR. ANDRE:  I think for this particular
argument, the way it's briefed, it's attorney argument.  We
didn't have expert declarations that we put in.

THE COURT:  How am I supposed to know -- you
presented that argument to other judges who didn't, I don't
think, include that into the terms, so I'm just not sure I
understand what I'm supposed to do with attorney argument
where you're telling me what a person of skill in the art
would think, but it's not necessarily just an ordinary
meaning.  I mean, how am I supposed to understand that?

MR. ANDRE:  Well, I think the -- you know, I
would love to have an expert witness in here to give you
that --

THE COURT:  Well, you could have had an expert
witness.  You chose not to; right?

MR. ANDRE:  Fair enough.  Fair enough.

But I think the way I'm thinking about this term
is more along the lines of the word scanner.  That's really
what we're talking about is just scanner.  And is the word
scanner, did anyone give that a very special meaning in this
case?  That's what it comes down to.

THE COURT:  All right.  Well, I think the way it
worked is that because downloadable scanner isn't really
referenced in the '494 patent, so they looked at the '194

09:13:52 1    patent and saw the code scanner and used that.  Right?

09:13:56 2              MR. ANDRE:  That's correct.

09:13:57 3              THE COURT:  Why is that not appropriate?

09:13:59 4              MR. ANDRE:  Because it wasn't an expressed

09:14:01 5    definition of the word scanner in a code scanner.  I mean,

09:14:06 6    the idea here, the way I see it anyway is that it was an

09:14:11 7    expressed definition of a scanner or a downloadable scanner,

09:14:14 8    and it wasn't.  It's an embodiment described in the '194

09:14:19 9    patent.  And we went back to the '194, not so much for the

09:14:23 10   scanner but for the DSP once again.  The DSP, that was how

09:14:28 11   this issue keeps coming up, it's in relation to deriving the

09:14:36 12   downloadable security profile or the profile.

09:14:37 13             THE COURT:  But the '194 patent is incorporated

09:14:40 14   by reference in the '194 and the '086 patent.

09:14:45 15             MR. ANDRE:  That's right.

09:14:45 16             THE COURT:  The two patents that have the claims

09:14:47 17   that we're looking at for this term; right?

09:14:49 18             MR. ANDRE:  That's correct.

09:14:50 19             THE COURT:  So I can look at that?

09:14:51 20             MR. ANDRE:  Absolutely.  And I think it's

09:14:55 21   important to look at because it does give a basis for the

09:14:55 22   profile.  So what the claims call for is a scanner that

09:15:02 23   derives a profile.  And to limit to one particular

09:15:04 24   embodiment where there has been no express disavowal in the

09:15:10 25   prosecution, there has been no specific definition in the

09:15:13  1    specification, and the only reference to the Federal Circuit

09:15:16  2    was in the background section talking about the patents

09:15:19  3    where it was not an issue for dispute for claim

09:15:24  4    construction, I don't think that is enough to say there is a

09:15:26  5    controlling law that would give this a special meaning or

09:15:31  6    that there is anything in the specification or prosecution

09:15:33  7    history for the word scanner to have a special meaning as

09:15:37  8    Rapid7 proposes.

09:15:44  9             If you don't have any further questions, I will

09:15:48 10    go to the next term.  I think the papers are pretty clear.

09:15:50 11             THE COURT:  No, I'm going to do one term, term

09:15:52 12    by term.

09:15:53 13             MR. ANDRE:  I'm sorry.  I'll let Rapid7.

09:15:57 14             THE COURT:  Great.  Thank you.

09:16:02 15             MR. GAUDET:  Good morning, Your Honor.

09:16:05 16             THE COURT:  Good morning.

09:16:06 17             MR. GAUDET:  Matthew Gaudet here on behalf of

09:16:09 18    Rapid7.  In the interest of time, I'm going to jump forward

09:16:12 19    to slide 5 in our presentation.

09:16:18 20             It's clear from your questioning you're very

09:16:22 21    familiar with the background here.  These are the two

09:16:25 22    competing constructions.  And the only point I want to make

09:16:28 23    here before we get right into the Federal Circuit decision

09:16:31 24    is that Finjan's proposed constructions on the left, scanner

09:16:36 25    for scanning downloadables is meaningless.  That's just --

09:16:40  1    that's a sort of repeating the phrase and begs the question,

09:16:44  2    well, what is a scanner in this context.  And their real

09:16:48  3    answer in the briefing is it's functional.  It's anything

09:16:51  4    that performs the rest of the claims, namely deriving

09:16:56  5    security profile data for the downloadable.

09:16:59  6            And I'm emphasizing this because when we get to

09:17:03  7    the Federal Circuit, that was exactly the issue that the

09:17:05  8    Federal Circuit considered and rejected.  And that is the

09:17:08  9    only reason claim 10 is alive today and not dead like claim

09:17:12 10    1.

09:17:13 11            So their position is essence, and if I have got

09:17:18 12    my highlighter, my red dot here, that anything that does the

09:17:22 13    rest of the claim language, the for deriving security

09:17:26 14    profile data for the downloadable including a list of

09:17:29 15    suspicious computer operations that may be attempted, if you

09:17:32 16    do that, you're a scanner.  That's their position.  And that

09:17:36 17    is exactly what the Federal Circuit considered.

09:17:38 18            So going now to the Federal Circuit language,

09:17:42 19    this is slide 6, this is the punch line, but I'm going to

09:17:42 20    put the decision up.  The punch line, the Federal Circuit

09:17:46 21    says a code scanner in claim 10, the code scanner

09:17:52 22    downloadable scanner in claim 10 is a code scanner that

09:17:56 23    generates the DSP data by decomposing the code using

09:18:00 24    conventional parsing techniques.

09:18:02 25            But I actually want to go to the document camera

09:18:06 1    and spend a little bit of time talking about exactly what

09:18:09 2    the Federal Circuit did.  The background here is that the

09:18:13 3    PTAB considered an IPR filed by Palo Alto Networks on both

09:18:18 4    independent claims, claim 1 and claim 10.

09:18:20 5            THE COURT:  I have read that.

09:18:21 6            MR. GAUDET:  Absolutely.  And the part I want to

09:18:24 7    call your attention to, Your Honor, is -- and this is in the

09:18:28 8    decision, star three, the claims are almost verbatim.  This

09:18:34 9    language, this functional language that they're saying is

09:18:36 10   the only thing required by claim 10, that is verbatim in

09:18:41 11   claim 1 and it's highlighted in the decision itself up in

09:18:44 12   claim 1.  Deriving security profile data for the

09:18:48 13   downloadable including a list of suspicious computer

09:18:50 14   operations that may be attempted by the downloadable.  The

09:18:53 15   difference is that claim 10 recites a downloadable scanner.

09:18:57 16           That is -- it's the very next paragraph then

09:19:02 17   that the Federal Circuit says -- talks about the

09:19:04 18   downloadable scanner in claim 10.  That is the difference.

09:19:09 19   That's why one claim lived and the other claim was canceled.

09:19:12 20           And then, Your Honor, the Federal Circuit gets

09:19:15 21   very expressive about it and addresses exactly the argument

09:19:18 22   that Finjan makes in its brief.  In particular, this is now

09:19:22 23   at star nine.  Now the background here, the names are going

09:19:27 24   to be reversed because this is the validity phase, Palo Alto

09:19:32 25   Networks went to the Federal Circuit and said so long as the

thing in the prior art, it was an immolator, that you found,

that the Patent Office found invalidates claim 1, so as long

as it does this function, it derives security profile data,

that's good enough and claim 10 should be invalidated, also.

And that's exactly the argument they're making today.  So as

long as you do the function, that's all claim 10 requires.

The Federal Circuit expressly rejected that.  They said,

they set up the argument, Palo Alto Networks argument

depends on interpreting the code scanner limitation as a

functional rather than structural limitation.  Then they

rejected it.

        They told us what the code scanner has to be up

front.  They say there is no evidence, there is not

sufficient evidence that there was not a code scanner,

that's the key difference between claim 1 and claim 10, and

that's the only reason that we're here today.  If the

Federal Circuit had not bought this, claim 10 would have

been invalidated just like claim 1 and there would be no

claim 10 to go forward on.

        So, Your Honor, we obviously disagree with the

characterization from Finjan about what happened in the

Federal Circuit decision.  That was recent.  That was in

July of 2019 that this decision came down.

        The other decision is from Judge Freeman, and

that's -- her decision, sorry, Blue Coat -- in the *Cisco*

09:21:00 1   case, they all start swirling a little bit.  In the *Cisco*

09:21:05 2   case --

09:21:05 3                THE COURT:  That was before the Federal Circuit.

09:21:07 4                MR. GAUDET:  Before the Federal Circuit, but it

09:21:09 5   is largely in line with what the Federal Circuit said.  What

09:21:12 6   she says, and I'll put a red line between what she says and

09:21:17 7   what we're proposing on the next slide.  She says software

09:21:20 8   that searches code to identify suspicious patterns or

09:21:25 9   suspicious computer operation.  She rejected.

09:21:27 10                THE COURT:  But they don't really contest the

09:21:31 11  identifies suspicious patterns or suspicious computer

09:21:37 12  operation aspect of our computer operation, they are having

09:21:41 13  problem with the conventional techniques which I'm not sure

09:21:44 14  I see in her construction.

09:21:45 15                MR. GAUDET:  It's not in there, but that wasn't

09:21:47 16  the fight that she addressed in her order.  They say that we

09:21:50 17  proposed it and rejected it.  The issue that her order was

09:21:54 18  about was whether or not the scanner is limited to machine

09:21:58 19  code, so the only thing the scanner could act on was

09:22:02 20  literally ones and zeros, executable code.  She said no, the

09:22:07 21  scanner can be machine code, it can be assembly code, it can

09:22:10 22  be things that -- it can be other kinds of codes.  And we

09:22:14 23  agreed, we are not revisiting that.  That was the part --

09:22:18 24                THE COURT:  What do you think of their argument

09:22:21 25  that because it can act on machine code and other types of

09:22:25 1   things that don't fit into your decomposes code using

09:22:31 2   conventional parsing techniques?

09:22:34 3            MR. GAUDET:  Your Honor, there was once a form

09:22:38 4   of that argument that maybe worked when they were saying

09:22:40 5   it's not limited to machine code.  Their argument as it

09:22:44 6   stands today is simply contradicted by the specification.

09:22:47 7   The specification literally says you can do this on all

09:22:50 8   these different types.

09:22:52 9            And so let me move forward over to here, the

09:23:00 10  code scanner, about seven lines down, that is language, the

09:23:10 11  code scanner using conventional parsing techniques to

09:23:14 12  decompose the code including all prefetched components of

09:23:17 13  the downloadable into the DSP data.  So this is talking

09:23:21 14  about code generally, not just machine code.

09:23:28 15            And then likewise, also references here

09:23:34 16  disassembling machine code of the downloadable.  So to be

09:23:37 17  clear, decomposing and disassembling, one is almost sort of

09:23:43 18  a subset of the other, disassembling means you got machine

09:23:49 19  code, ones and zeros and you need to turn that into

09:23:52 20  something that sort of a human can read or it's not yet ones

09:23:56 21  and zeros.  It hasn't been assembled yet, so you would

09:24:01 22  disassemble machine code.  The previous construction that we

09:24:05 23  had that *Cisco* proposed to Judge Freeman talked about

09:24:08 24  disassembling machine code, and I understand that that would

09:24:12 25  be too limiting.

09:24:13  1          But decomposing is a broader term that simply

09:24:19  2    means you go through the various -- here we go, this is now

09:24:25  3    -- you go through the -- you go through the code and you

09:24:28  4    break it up into its constituent operations, whether it's in

09:24:33  5    machine code form, whether it's already been disassembled,

09:24:38  6    whether it's in java form.  So the idea of decomposing code

09:24:43  7    using conventional parsing techniques, that is talking about

09:24:46  8    something you can do with machine code.  You can also do it

09:24:50  9    with any code.  That's good old fashion what a scanner does.

09:24:54 10          And so again, when they were shooting at a

09:25:00 11    construction that was limited to disassembling machine code,

09:25:04 12    the argument made sense.  But that phrase, it's just not

09:25:07 13    limited, it's just not limited the way they're suggesting so

09:25:11 14    there is no contradiction with the specification.

09:25:15 15          The other point that of course --

09:25:17 16          THE COURT:  Since I gave Mr. Andre a little bit

09:25:20 17    of a hard time about his lack of evidence of that, am I just

09:25:27 18    supposed to believe you?

09:25:28 19          MR. GAUDET:  No.  Actually, when you read the

09:25:33 20    '194 specification, that's what it's describing.  The '194

09:25:35 21    is talking about doing this with java applets and java

09:25:41 22    applets are not ones and zeros, java applets are actually

09:25:45 23    something you can read.  It's talking about decomposing,

09:25:49 24    using additional parts and techniques, handling things that

09:25:51 25    are not machine code that are things like java and then when

09:25:54 1   it's talking about machine code, that's when it uses the

09:25:58 2   different phrase disassembling, simply you read the

09:26:01 3   specification and it covers it all.

09:26:09 4        Moreover, maybe it can be the first point, we

09:26:13 5   have the benefit of it's exactly what the Federal Circuit

09:26:16 6   said.  So this shows --

09:26:17 7        THE COURT:  What about the argument that that

09:26:19 8   wasn't argued to the Federal Circuit?

09:26:22 9        MR. GAUDET:  Your Honor, it's a little bit --

09:26:26 10   it's a little bit odd to sort of go into a Federal Circuit

09:26:31 11   decision and go into its, if you will, prosecution history.

09:26:35 12   It just doesn't matter.  I don't know what was argued in

09:26:38 13   that case any more than any other Federal Circuit decision.

09:26:41 14   I know what they said, what they did, and had they not done

09:26:44 15   it, it's clear the claim would have been invalidated.  That

09:26:47 16   in the course of saying this is the difference between claim

09:26:50 17   1 and claim 10, they rejected Finjan's argument and said

09:26:54 18   exactly what the downloadable scanner in claim 10 is and

09:26:57 19   then why that differentiates from claim 1.  This is not --

09:27:02 20   it's not a patent proceeding in the Patent Office where the

09:27:07 21   particular argument Finjan made would have, you know,

09:27:11 22   perhaps be treated differently than the resolution, instead

09:27:14 23   it's the Federal Circuit.  What they said is what they said.

09:27:16 24        THE COURT:  What about the argument that the

09:27:18 25   portions of the '194 patent that you showed me are simply an

embodiment?

MR. GAUDET:  Your Honor, they -- well, I guess plaintiff will always say anything in the specification is an embodiment.  Everyone agrees that it is at the very least the only embodiment.  I'm going to show you some language from the decision, the *Alice* decision from Judge Freeman in the *Blue Coat* cases, where she says the only embodiment for even deriving security profile data is this scanner.  And, in fact, the very exact process.  So when it comes to a scanner, that's it.

And it's not as if it says here is an embodiment of a scanner, it says here is the scanner.  The scanner uses conventional parsing techniques.  There are no unconventional or inventive parsing techniques, so there is nothing else.  In other words, to say something is a scanner, we're not talking about like the scanner in a copy room where you put a document down and it would send you an image of it.  In the context of software, when you say a scanner, you are by definition talking about something that decomposes code using as they put -- as the phrase goes, conventional parsing techniques.  Conventional -- this isn't something they invented, it's not something new and different, it is literally the very definition of what that device does.

And the other point I want to make, Your Honor,

09:29:09 1   they didn't specifically raise it here, but either in the

09:29:13 2   briefing or maybe in their slides, they said that there are

09:29:17 3   other embodiments in the '086 patent and the '494 patent

09:29:21 4   that wouldn't be covered.  And what they point to is

09:29:25 5   something that leads up to an invention about mobile

09:29:29 6   protection code.  And this is sort of the interesting thing

09:29:34 7   about these patents.  You could read the specification, it's

09:29:38 8   actually printed with the '494 patent and the '086 patent,

09:29:42 9   and have absolutely no idea what these claims are about

09:29:45 10  because there is nothing about scanners in here or the whole

09:29:48 11  process.  These patents specifications are about a

09:29:51 12  completely different invention called mobile protection

09:29:54 13  code, which is something as they say in the specification

09:29:57 14  that it would travel with the downloadable from a gateway,

09:30:02 15  and when it arrived at the destination it would protect the

09:30:07 16  computer.  These claims have absolutely nothing to do with

09:30:10 17  that.  So it's not surprising that in the body of the '086

09:30:14 18  and '494 patents, they can find things that have nothing to

09:30:20 19  do with the claims at all, but that's not the question.  The

09:30:23 20  question is, you have claimed a downloadable scanner.  What

09:30:26 21  is a downloadable scanner?  And the specification only gives

09:30:30 22  one answer.

09:30:30 23          Your Honor, that's everything that I had on this

09:30:33 24  term.

09:30:35 25          THE COURT:  Okay.  Mr Andre, is it your position

09:30:43 1    that anything that does the language in the claim elements,

09:30:49 2    claim 10, it comes after downloadable scanner is a scanner?

09:30:58 3                 MR. ANDRE:  I didn't catch that.

09:30:59 4                 THE COURT:  Put claim 10 up there.  Is it your

09:31:07 5    position that anything that does the deriving security

09:31:11 6    profile for the downloadable including the list is a

09:31:16 7    scanner?

09:31:16 8                 MR. ANDRE:  That's correct, Your Honor.

09:31:17 9                 THE COURT:  And why isn't it true that the

09:31:20 10   Federal Circuit rejected that argument?

09:31:21 11                MR. ANDRE:  Your Honor, I actually argued that

09:31:24 12   Federal Circuit case to the Federal Circuit, and we were

09:31:29 13   appealing the invalidation claim 1 of the PTAB, but we were

09:31:34 14   trying to confirm the validity of claim 10.

09:31:36 15                THE COURT:  And the other folks were trying to

09:31:38 16   get PTAB reversed on claim 10, so the argument that was just

09:31:42 17   made to me is that the real difference here and the reason

09:31:44 18   that claim 10 survived when claim 1 didn't was because of

09:31:49 19   the downloadable scanner.  Why isn't the downloadable

09:31:52 20   scanner have to be something different than just something

09:31:55 21   that performs that function because something that performs

09:31:57 22   that function was invalidated with claim 1?

09:32:02 23                MR. ANDRE:  The way the Federal Circuit -- to be

09:32:05 24   candid I thought they should have found claim 1 valid as

09:32:07 25   well.  I argued the DSP was.  That's not how it came out.  I

09:32:14  1    argued in the PTAB the prior art didn't disclose, the PTAB

09:32:19  2    decided that the prior art didn't disclose structures, they

09:32:23  3    didn't disclose a scanner, I don't think they disclosed the

09:32:26  4    database manager.  So what the prior art did was describe in

09:32:32  5    some functional language but never described any structure.

09:32:35  6    So that's what the -- that's how the Federal Circuit came

09:32:38  7    down on that decision that there was nothing identified

09:32:42  8    during the oral argument with the Federal Circuit -- they

09:32:46  9    asked my opponent, where is the structure?  Where is the

09:32:51 10    downloadable scanner?  There is nothing that says there is a

09:32:53 11    scanner in the prior art.  And so he was unable to identify

09:32:58 12    it.

09:32:58 13            So the Federal Circuit identified the fact that

09:33:00 14    there was a structure in the claim, a system claim versus a

09:33:04 15    method claim, and the structure that identified in the

09:33:08 16    system claim was the point of novelty or got over the prior

09:33:13 17    art at the Federal Circuit at that point.

09:33:18 18            The fact that they said there is a structure,

09:33:21 19    any structure, the prior art didn't identify a general

09:33:25 20    scanner or anything, they identified no structure at all.

09:33:29 21    So the Federal Circuit wasn't attempting to limit the

09:33:33 22    scanner to a particular type of scanner, that's our point.

09:33:35 23    And when we made that argument to the Federal Circuit, that

09:33:42 24    was one thing that resinated at the oral argument and in the

09:33:45 25    opinion that's what the Federal Circuit landed on.  The

09:33:49 1   background section that talks about the embodiment of the

09:33:51 2   scanner was not meant, at least we never had a chance to

09:33:54 3   argue that that was a claim construction issue.

09:33:56 4            With respect to Judge Freeman, Judge Freeman has

09:34:02 5   looked at this issue both earlier with the *Blue Coat II* 101

09:34:08 6   decision, and then also with --

09:34:10 7            THE COURT:  Is it correct that you don't dispute

09:34:13 8   that the downloadable scanner searches code to identify

09:34:18 9   suspicious patterns or suspicious computer operations?

09:34:27 10           MR. ANDRE:  I'm trusting my memory a little bit.

09:34:30 11  I believe Judge Freeman brought that up and said this is

09:34:33 12  what the actual '194 patent says.

09:34:39 13           THE COURT:  But that language to identify

09:34:42 14  suspicious patterns is in defendant's proposed construction,

09:34:46 15  that's not something that you raised that you really have an

09:34:50 16  issue with?  And I'm asking you, do you dispute that the

09:34:54 17  scanner scans downloadables to identify suspicious patterns

09:34:58 18  or suspicious computer operations?

09:35:00 19           MR. ANDRE:  We don't dispute that, Your Honor.

09:35:02 20  That's why I'm saying with Judge Freeman she offered that

09:35:02 21  construction based on the '194 patent.  I will show you

09:35:02 22  where that is with the '194.  It's in the paragraph that

09:35:22 23  Mr. Gaudet showed you in his slides.  At the end of it, the

09:35:22 24  paragraph says it will be appreciated that the code scanner

09:35:30 25  may search code for any pattern which is undesirable or

suggests that the code was written by a hacker.  So that's

consistent with what judge -- that's where Judge Freeman got

her construction from.  And that's right below the paragraph

which gives the preferred embodiment.  So it gives a

preferred embodiment of this code scanner that Rapid7 would

like you to limit the claims to, but then it says it may be

appreciated.

So it's also -- it's giving that exception that

it may be appreciated that the code scanner may search the

code for any patterns, not just the kind of patterns that

they're talking about on top of the paragraph.

So Judge Freeman offered a compromise situation

during the oral argument.  And because as I told Your Honor

when I started, we've made the same thing -- taken the same

position in every case, we say ordinary meaning because we

don't want to be inconsistent.

THE COURT:  Well, claim 10 already says that it

does it for suspicious, elicit suspicious computer

operations.

MR. ANDRE:  That's correct.  So Judge Freeman

relied on this.  She said would you agree -- just like

you're doing now, would you agree that that is correct and

we agreed with it, therefore the construction that Judge

Freeman gave us in *Cisco*, software searches code to identify

suspicious patterns or suspicious computer operations, we

09:36:57 1    acquiesced to.  We just did not want to be limited to that

09:37:01 2    one particular embodiment that Rapid7 is advocating for

09:37:05 3    here.

09:37:05 4              And also, as Judge Freeman said, this goes back

09:37:09 5    to the slide 11 on our deck, that the court is unpersuaded

09:37:14 6    by *Cisco*'s argument that a downloadable scanner is linked to

09:37:19 7    the embodiment where the code scanner is described to

09:37:24 8    disassemble machine code.  That specific embodiment that

09:37:27 9    they're trying to advocate, the same group of lawyers that

09:37:30 10   were in *Cisco* are arguing for here as well, Judge Freeman

09:37:33 11   rejected that because of that language in the '194 patent.

09:37:42 12             If Your Honor has anymore questions, should I go

09:37:44 13   to the next element?

09:37:46 14             THE COURT:  Yes.  Thank you.

09:37:48 15             MR. ANDRE:  So the next element is a list of

09:37:51 16   suspicious computer operations that may be attempted on the

09:37:57 17   '086.  And I'll be candid, Your Honor, I didn't really

09:38:03 18   understand the dispute here.

09:38:05 19             THE COURT:  I don't understand the dispute here,

09:38:08 20   either, because it doesn't seem like -- you guys are saying,

09:38:12 21   yeah, it's in a received downloadable, but that language is

09:38:16 22   already incorporated in the claim.  Your issue here seems to

09:38:20 23   be that it was redundant and unnecessary.  So I don't

09:38:24 24   understand what the -- what the practical import of this

09:38:28 25   dispute is.

09:38:31 1          MR. ANDRE:  Your Honor, I didn't either.  I'll

09:38:34 2  be completely honest, I couldn't figure out why we couldn't

09:38:38 3  agree on it.  It seems like we're talking about

09:38:41 4  substantively the same thing.

09:38:42 5          THE COURT:  Let me ask the defendants.

09:38:44 6          MR. ANDRE:  As I was flying cross-country for

09:38:47 7  this hearing, I reread it again.  And I don't know if this

09:38:50 8  is what they're trying to say, but just for curiosity sake,

09:38:54 9  if you read it, the language, they may be trying to say that

09:38:59 10 the list, the actual list itself is in the received

09:39:04 11 downloadable, not in the computer operations.  The way it's

09:39:12 12 set up deriving security profile data, and the security

09:39:16 13 profile data includes a list of suspicious operations that

09:39:19 14 may be attempted, but when I went back and looked, I thought

09:39:22 15 maybe they're trying to say that the list of computer

09:39:25 16 operation is in the received downloadable, you get the

09:39:28 17 downloadable and there is a list included in that

09:39:31 18 downloadable.  Not that is deriving a security profile that

09:39:35 19 includes a list.

09:39:36 20          So what Finjan's patents are talking about does

09:39:39 21 deriving a profile and when it derives it, there is also a

09:39:42 22 list of these operations that may be attempted.  The only

09:39:45 23 thing I can think of, the only reason this would be in

09:39:48 24 dispute is they're going to try to argue that the actual

09:39:51 25 list is in the downloadable when it comes to the computer.

09:39:54 1    That's the only thing I can figure out.  I'm hopefully wrong

09:39:57 2    on that one.

09:39:58 3              THE COURT:  Let me understand what is the

09:40:00 4    dispute here and why do I need to decide this?

09:40:04 5              MR. GAUDET:  Sure, Your Honor.  First of all,

09:40:06 6    what he referenced, that's not at all the issue.  It's

09:40:10 7    literally we want what Judge Alsup said which is this claim

09:40:14 8    --

09:40:14 9              THE COURT:  I asked you guys to go talk about

09:40:16 10   things and try and work them out.  You have twenty terms,

09:40:19 11   you took twenty-five minutes which I think is garbage.  I

09:40:23 12   can't believe you actually could have worked out anything in

09:40:27 13   twenty-five minutes.  Start with my position on that, you're

09:40:29 14   asking me to deal with twenty, now nineteen terms and this

09:40:32 15   seems like just a waste of time.  Why isn't it a waste of

09:40:35 16   time?

09:40:36 17             MR. GAUDET:  Your Honor --

09:40:37 18             THE COURT:  I get it, you want exactly what

09:40:40 19   Judge Alsup said, but that doesn't mean that what they're

09:40:42 20   saying isn't right.

09:40:44 21             MR. GAUDET:  Your Honor, the reason we want this

09:40:47 22   in here is because in another case with Finjan in a

09:40:51 23   different matter, we had exactly this scenario where at

09:40:54 24   claim construction we agreed something is a requirement of

09:40:56 25   the claim, so it didn't go into construction.  And at

09:41:01 1    summary judgment, they took the opposite position.  And we

09:41:04 2    just want it to be clear that these operations, and we

09:41:08 3    agree, we all do agree, and we just want that nailed down.

09:41:12 4    And that's what we asked at the meet and confer.

09:41:16 5             THE COURT:  Mr Andre, do you agree that I'm not

09:41:18 6    going to see at summary judgment some statement that the

09:41:21 7    list of computer operations, that it's in -- I don't even

09:41:31 8    know.  What is it that --

09:41:33 9             MR. ANDRE:  Your Honor, what I will say, I don't

09:41:35 10   know what he's referring to at summary judgment.  We have

09:41:37 11   always taken the position that when you derive a security

09:41:40 12   profile data, you derive it, you derive what the data is

09:41:45 13   from the downloadable.  The security profile data includes a

09:41:48 14   list of suspicious computer operations that may be attempted

09:41:51 15   by the downloadable.  We have never argued otherwise.  I

09:41:54 16   don't know what Mr. Gaudet is talking about, but you won't

09:41:57 17   see this at summary judgement, I promise you.

09:42:00 18            THE COURT:  Is that okay?

09:42:01 19            MR. GAUDET:  Yeah, Your Honor, I think I

09:42:04 20   understand it's a list derived from the operations that are

09:42:07 21   in the downloadable, it's not derived from hey,

09:42:10 22   theoretically maybe that downloadable might say X, Y and Z,

09:42:13 23   you look at the downloadable, there is the operation, there

09:42:16 24   is the operation, there is the operation, it's coming, the

09:42:19 25   list is derived from the operations in that downloadable,

09:42:22 1   not some master list of possible, that's the issue.  If he

09:42:26 2   agrees to that and we got that on the record, we ought to be

09:42:28 3   good.

09:42:29 4              MR. ANDRE:  I don't understand what he's talking

09:42:30 5   about.  I'm asking my colleague, James, here, Mr. Hannah.

09:42:35 6   Do you know what he's talking about?

09:42:36 7              MR. GAUDET:  That surprises me because that's

09:42:38 8   exactly what the judge said.

09:42:39 9              THE COURT:  You guys need to figure out what

09:42:41 10  you're talking about.  Go ahead.  Talk to each other and try

09:42:46 11  and figure it out, because this, I don't understand what the

09:42:49 12  dispute is.

09:43:14 13              (Discussion off the record.)

09:48:09 14              THE COURT:  All right.  Where are we?

09:48:12 15              MR. GAUDET:  Your Honor, I do think that they --

09:48:15 16  I think they substantively disagree with this construction.

09:48:18 17              THE COURT:  Let me ask.  Is the list of

09:48:20 18  suspicious operations derived from the received downloadable

09:48:26 19  by evaluating that downloadable or is it a more generic

09:48:31 20  list?

09:48:32 21              MR. HANNAH:  So Your Honor, the way that -- may

09:48:34 22  it please the Court, good morning.  Nice to meet you.

09:48:37 23              The DSP is derived from the received

09:48:41 24  downloadable.

09:48:44 25              THE COURT:  So what is --

09:48:45 1          MR. HANNAH:  That's what I have said seven times

09:48:49 2     now.  I said the DSP is derived from the received

09:48:52 3     downloadable.  They want to say, and I just confirmed, that

09:48:55 4     the list is in the received downloadable.  That's not

09:48:57 5     correct.

09:48:58 6          THE COURT:  He's already told me that's not what

09:49:00 7     he was trying to say.

09:49:01 8          MR. HANNAH:  He just told me off mic that the

09:49:04 9     list of operations has to be in the downloadable.

09:49:07 10          THE COURT:  I think what he's saying is that the

09:49:09 11     list has to be derived from something in the downloadable,

09:49:13 12     from looking at or evaluating the downloadable.  So it's not

09:49:18 13     just -- it's not just that the list is some we look at this

09:49:23 14     list for every single one, we look at this downloadable, we

09:49:27 15     say I evaluated this guy and I got -- I came up with this

09:49:33 16     list.  Is that what you're saying?

09:49:34 17          MR. GAUDET:  Your Honor, exactly, it's not some

09:49:38 18     just generic list.

09:49:39 19          THE COURT:  But he seems to be saying,

09:49:41 20     Mr. Hannah seems to be saying yes.

09:49:42 21          MR. HANNAH:  I'm saying I'm going with the claim

09:49:46 22     language and there is no way I'm going to argue on summary

09:49:49 23     judgment that DSP which advertises downloadable security

09:49:52 24     profile is derived from the received downloadable.

09:49:56 25     100 percent that's what the claim language says.  It's an

09:50:01 1    antecedent basis.

09:50:02 2          THE COURT:  You're not answering my question,

09:50:04 3    either.  I'm saying the issues, if I were to read their

09:50:09 4    language that they're trying to read in, let me remember

09:50:14 5    what it is, but -- in a received downloadable, if I read

09:50:21 6    that to mean not that the list already has to be in the

09:50:24 7    downloadable, but that the list is derived from evaluating

09:50:33 8    that downloadable, is that okay?

09:50:35 9          MR. HANNAH:  Yes.

09:50:35 10          THE COURT:  Is that okay with the defendants?

09:50:37 11          MR. GAUDET:  Your Honor, the only caveat is it's

09:50:43 12    based on -- it's the operations in the downloadable, that's

09:50:46 13    why I'm worried that he's hedging on that as if by derived

09:50:50 14    from the downloadable he means you can look generally at the

09:50:53 15    downloadable and see oh, look, it's a big file and then from

09:50:57 16    that run off.  It's that the operations in that list are

09:51:01 17    operations in the downloadable.  It doesn't have to be

09:51:04 18    called a list, it's not a list of the downloadable, but the

09:51:06 19    operations we're talking about are operations in the

09:51:09 20    downloadable, not operations somewhere else.  That's the

09:51:12 21    part I want to be sure that we have a meeting of the minds

09:51:12 22    on.

09:51:17 23          MR. HANNAH:  I think that's what I'm trying to

09:51:19 24    import, the fact that this list of operations has to be in

09:51:21 25    the downloadable.  Now I'm understanding their argument and

09:51:24 1  that's not true.  The list of the operations is in the DSP.

09:51:28 2  It absolutely has to be based on the claim language derived

09:51:31 3  from the received downloadable, no dispute.  And that's

09:51:33 4  exactly what Your Honor said.  And I unequivocally agree

09:51:41 5  with it.

09:51:42 6          I cannot agree saying that the list of

09:51:43 7  operations in the downloadable itself because it's not, it's

09:51:46 8  in DSP, that's what it says, deriving a security profile

09:51:51 9  data including a list of suspicious computer operations,

09:51:54 10 that's in the DSP, that's not in the downloadable.  But I

09:51:58 11 100 percent agree that in order to generate that list, to

09:52:00 12 derive that list, it's based on the particular received

09:52:03 13 downloadable.

09:52:04 14          MR. GAUDET:  I might have a phrasing suggestion

09:52:06 15 that could solve this.  If we go back to the proposed

09:52:10 16 construction instead, because it's a question of what's

09:52:24 17 modifying what.  It's a list that identifies computer

09:52:28 18 operations in a received downloadable that are deemed

09:52:33 19 hostile.  We're not saying the list is a thing that's

09:52:37 20 downloadable, it's a list that identifies computer

09:52:40 21 operations in a received downloadable that are deemed

09:52:42 22 hostile or potentially hostile.  Maybe the "of" created the

09:52:42 23 ambiguity that Mr. Andre was worried about.  The list isn't

09:52:52 24 the downloadable, the operations most certainly are.

09:52:56 25          MR. HANNAH:  I don't understand that at all.

09:52:57 1   The issue is in the received -- I really don't, Your Honor.

09:53:02 2   I mean, the issue is in the received downloadable, the way

09:53:06 3   it's written it says a list in a received downloadable.  The

09:53:09 4   list is in the DSP.  I have already confirmed on this record

09:53:13 5   that this list is derived from the received downloadable in

09:53:17 6   the claim.

09:53:17 7            THE COURT:  What if we said a list of computer

09:53:20 8   operations derived from a received downloadable?

09:53:24 9            MR. HANNAH:  Fine.  Absolutely.  A list of

09:53:26 10  computer operations derived from a received downloadable,

09:53:30 11  absolutely.

09:53:33 12            MR. GAUDET:  Again, as I understand it, the

09:53:39 13  operations are in the downloadable, the operations on this

09:53:42 14  list are operations found in the downloadable, not found

09:53:45 15  somewhere else.  If that's -- that's why I don't understand

09:53:48 16  why he's pushing back on that.  My fear about saying

09:53:54 17  something more general like derived from the downloadable is

09:53:57 18  it -- just like that, derived from downloadable can mean I

09:54:02 19  look at the downloadable and even though none of these

09:54:06 20  operations are listed in it, I go look at some other list

09:54:08 21  and figure out --

09:54:10 22            THE COURT:  I understand their argument.  Why

09:54:13 23  don't you tell me why what I just suggested is not supported

09:54:16 24  by the intrinsic evidence and then I'll give you all a

09:54:20 25  chance to respond.

09:54:20 1          MR. GAUDET:  Absolutely.

09:54:22 2          So, Your Honor --

09:54:24 3          THE COURT:  You guys can sit down.

09:54:30 4          MR. GAUDET:  Your Honor, the only narrow point

09:54:37 5     that we are making is that this has to be the operations

09:54:45 6     that might be attempted by that downloadable.  So you start

09:54:49 7     with this kind of antecedent basis in the claim language.

09:54:53 8     You receive the incoming downloadable, that's the first

09:54:56 9     underline.  The security profile data for that downloadable,

09:55:00 10    it list the operations that might be attempted by that

09:55:04 11    downloadable.  And there were sort of two lists, as you

09:55:11 12    figure out what this means, there are two lists in the

09:55:14 13    specification.  There is what we kind of refer to as the

09:55:17 14    global or master list.  This is in Figure 3 in the bottom of

09:55:21 15    column 5.  And this literally has a list of all the

09:55:25 16    different kinds of operations that a hacker might want to

09:55:28 17    use theoretically.

09:55:30 18         And our concern is when they just say derived

09:55:35 19    from the DSP, they might then turn around and say well --

09:55:41 20    not the DSP, the downloadable, a downloadable came in, I see

09:55:44 21    that the downloadable came from X source, I know that X

09:55:47 22    source has a reputation of doing really bad things so it's

09:55:54 23    possible that this downloadable could do any of these things

09:55:57 24    from this master list.  That's not what the claim is talking

09:56:01 25    about, and that's not what the specification is talking

09:56:03 1    about.   The specification is talking about this shorter

09:56:08 2    list.   The shorter list which it actually uses the code

09:56:13 3    scanner on are something like that to look to break apart on

09:56:16 4    a proactive basis and figure out what is this thing actually

09:56:22 5    going to do, what are the operations in this downloadable.

09:56:25 6    This is now at column 9.

09:56:27 7            So it's not -- it's not just generically

09:56:31 8    deriving because of some attribute of the downloadable, it's

09:56:35 9    saying what are the operations in the downloadable.   Now

09:56:38 10   that I have the operations in the downloadable, let me now

09:56:42 11   compare that specific list from the downloadable with the

09:56:44 12   master list.   And anything that's on my list of what's in

09:56:49 13   the downloadable that I know to be a suspicious operation,

09:56:54 14   I'm going to put that in the specific -- in a list of

09:57:00 15   suspicious operations the downloadable might perform.   So

09:57:04 16   when the downloadable arrives, it doesn't have a list in it.

09:57:07 17   Instead a downloadable --

09:57:08 18            THE COURT:   They're not saying it has a list in

09:57:10 19   it, they're not saying that, so don't make an argument.

09:57:14 20            MR. GAUDET:   Absolutely.

09:57:14 21            THE COURT:   I want you to focus on their issue

09:57:17 22   and the issue it seems to me is whether we're saying it has

09:57:20 23   to be something in the operations of the downloadable or

09:57:23 24   whether it just has to be derived from some aspect of the

09:57:26 25   downloadable.

09:57:27  1          MR. GAUDET:  Correct.  And the two reasons we

09:57:29  2   know that are it is the only thing -- it's recited in the

09:57:33  3   claim, get the downloadable and then you derive the profile

09:57:37  4   data with a list of the operations that might be attempted

09:57:40  5   by that downloadable.

09:57:42  6          And the only way, the way that the specification

09:57:46  7   describes the invention is you figure out what it is that

09:57:51  8   downloadable is going to do by using a scanner, and having

09:57:57  9   figured out what those operations are, we can now figure out

09:58:00 10   which of those operations in the downloadable is suspicious

09:58:03 11   and nonsuspicious.  That's it, Your Honor.

09:58:05 12          THE COURT:  Okay.  Mr. Andre or Mr. Hannah, you

09:58:11 13   can tag team it.

09:58:14 14          MR. ANDRE:  Your Honor, I'll be honest with you,

09:58:16 15   we'll leave this slide up there, but consistent with what

09:58:21 16   Mr. --

09:58:22 17          THE COURT:  I understand exactly what he's

09:58:24 18   saying.  He's saying, for example, he wants you to say I

09:58:27 19   looked at the downloadable and the operations that it might

09:58:31 20   perform.  Of those, these are the suspicious ones.  Is that

09:58:37 21   right?

09:58:37 22          MR. GAUDET:  Precisely.

09:58:37 23          THE COURT:  And he doesn't want you to say I

09:58:40 24   looked at the downloadable, it came from, you know, this

09:58:44 25   horrible source instead of looking at the operations and say

09:58:49 1    it came from a bad source, therefore it might perform any of

09:58:53 2    a generic set of operations that the downloadable itself

09:58:57 3    might not be able to perform.

09:59:01 4              MR. ANDRE:  I'll let Mr. Hannah argue this

09:59:05 5    issue.

09:59:10 6              MR. HANNAH:  So I think that the downloadable

09:59:17 7    scanner can take in -- can take in a lot of different

09:59:21 8    attributes.  I think that the DSP has to be derived based on

09:59:26 9    the downloadable and to determine the operations that may be

09:59:29 10   attempted.  That's plain --

09:59:31 11             THE COURT:  But the operations that may be

09:59:33 12   attempted -- I guess the question I have is if the claim

09:59:38 13   language says operations that may be attempted by that

09:59:42 14   downloadable, why is it that you wouldn't be looking at the

09:59:45 15   operations of that rather than just, you know, something

09:59:49 16   like the source of it where you might say there could be any

09:59:57 17   -- you know, a bunch of operations that would be on the

10:00:02 18   list, but that downloadable isn't even capable of

10:00:05 19   performing?

10:00:06 20             MR. HANNAH:  Well, first of all, I think the

10:00:08 21   embodiment, looking at the sources in the '194.

10:00:11 22             THE COURT:  Yes.  Around column 9.

10:00:14 23             MR. HANNAH:  It actually specifically talks

10:00:16 24   about these and look at the source and different attributes

10:00:18 25   of it.  So I mean, this wasn't the argument that was raised

10:00:23 1    in the briefing, but I think that that information is

10:00:26 2    clearly one of the indications that can be used to generate

10:00:30 3    the DSP.

10:00:32 4            THE COURT:  Show me where you're referring to.

10:00:36 5            MR. HANNAH:  I'm doing this on the fly and

10:00:39 6    straight from memory, but I have done it before.

10:00:41 7            THE COURT:  You're doing well, just keep going.

10:00:45 8    Take your time.

10:00:46 9            MR. HANNAH:  There is something specific where

10:00:47 10   it talks about, you can look at the source to determine --

10:01:03 11   in any event, I can take the slides and go through it on my

10:01:10 12   computer.  In any event, I think one of the issues now that

10:01:14 13   I'm hearing this is they keep saying that the operations

10:01:17 14   have to be in the downloadable.  Well, looking at their

10:01:19 15   slide, on slide 20, you see how it talks about the

10:01:24 16   disassembling of machine code.  Now I know Your Honor said

10:01:28 17   that we don't have evidence of it, and you're supposed to

10:01:31 18   just believe me, hopefully you do believe me, a machine code

10:01:35 19   is written in ones and zeros.

10:01:37 20           THE COURT:  I understand.

10:01:38 21           MR. HANNAH:  So in order to do machine code you

10:01:41 22   actually don't know what the operations are.  You have to

10:01:44 23   disassemble them, resolve the commands, and then say based

10:01:48 24   on the information I have these are the operations that I

10:01:50 25   think may be attempted by the downloadable, that's the whole

10:01:54  1    point of the DSP is that you're trying to determine what the

10:01:59  2    downloadable is going to do.  This is a behavioral detection

10:02:03  3    of it.

10:02:03  4            So when they keep saying that it has to be a

10:02:06  5    list or an operations that are in the downloadable, it's

10:02:10  6    actually -- that's why the claim language says it's to

10:02:14  7    generate the DSP and the DSP includes a list that may be

10:02:18  8    attempted by the downloadable.  So this whole notion that we

10:02:22  9    have to find operations within the downloadable or put those

10:02:26 10    operations on the list I think is contrary to the

10:02:29 11    specification and to the claims.

10:02:34 12            THE COURT:  All right.  Why don't you, while

10:02:36 13    we're going to the next term, take a look at that patent and

10:02:42 14    tell me if there is anything that supports your position

10:02:47 15    that it could be something like a source, et cetera.

10:02:54 16            MR. HANNAH:  I can take a look at that.

10:02:57 17            Oh, found it.  That was a quick break.

10:03:01 18            MR. ANDRE:  Maybe.

10:03:02 19            MR. HANNAH:  Maybe.  Let me take a look.

10:03:11 20            MR. ANDRE:  Why don't you take a break.

10:03:12 21            MR. HANNAH:  Let me take a little break.  But it

10:03:16 22    says on column 637 it talks about path for, it says the URL

10:03:25 23    comparator examines the URL identifying the source of the

10:03:28 24    downloadable to be stored in the URL database to determine

10:03:29 25    whether the downloadable comes from a trusted source.  Based

10:03:33 1    on the security policy the URL comparator may deem the

10:03:37 2    downloadable suspicious if it comes from an untrustworthy

10:03:41 3    source.

10:03:41 4              So there is specific identification of different

10:03:44 5    embodiments and there are different paths that are within

10:03:47 6    there.  Again, I would stick to this -- I mean, I think that

10:03:51 7    we should stick to the claim language and as we've already

10:03:54 8    put on the record what construction we would be comfortable

10:03:57 9    with.

10:03:57 10             Thank you, Your Honor.

10:04:12 11             MR. GAUDET:  I don't want to belabor, but would

10:04:15 12   you like to hear a very brief response to that?

10:04:18 13             THE COURT:  Sure.

10:04:19 14             MR. GAUDET:  I believe what Mr. Hannah

10:04:20 15   identified is not part of the derivation of security profile

10:04:25 16   data, instead it's talking about, there are other aspects of

10:04:28 17   the system -- well, what he just pointed to is not what's

10:04:33 18   claimed.  If something from a trusted source, it never ties

10:04:38 19   that into using that to determine a list of suspicious or

10:04:42 20   nonsuspicious operations.  It might just say good, you get

10:04:45 21   to come through or no, you're blocked.  But the disclosure

10:04:49 22   of let's now derive a security profile is completely

10:04:52 23   unconnected to what he just cited.

10:04:55 24             THE COURT:  Okay.  Let's go to appended

10:05:06 25   downloadable.

MR. ANDRE:  Appended downloadable, what seems to be the major dispute here, Your Honor, is really where it is appended.  Rapid7 would like to have it limited to do appending to the end of the downloadable.  There is a lot of basis for not going that way.  We just think it means being attached to the downloadable, the ordinary meaning.

We go to the actual claim language, there is nothing in the claim language that would limit this appending to the end of the downloadable, just merely appending a representation, download.  We said all along appending is just attaching a representation of the downloadable security profile data to the downloadable and that's the proper construction.

There has been two issues that two people, two different bodies have interpreted this to some degree.  The PTAB stated that they would take the petitioner's position construction of appended to mean attached or attaching.  That was not our position, that was what the other side had asked for from the petitioner in that case, in *Palo Alto Networks*.  That's what the PTAB construed.

THE COURT:  Is that under the broadest reasonable interpretation standard?

MR. ANDRE:  I believe it was at that time period, 2016, I believe it was, Your Honor.  It was not the Phillips standard.

10:06:39 1        The biggest issue with the Rapid7's proposed

10:06:46 2    construction is it would --

10:06:47 3        THE COURT:  I'm sorry, you said two courts

10:06:50 4    decided.

10:06:50 5        MR. ANDRE:  The court in the Southern District

10:06:55 6    of California.

10:06:56 7        THE COURT:  That was based on, that relied to

10:06:58 8    some extent on expert testimony.

10:07:01 9        MR. ANDRE:  And extrinsic evidence as to

10:07:04 10   additional definitions, we'll get to that.  But it doesn't

10:07:08 11   read out the preferred embodiment on the '086 patent, column

10:07:13 12   11, lines 11 through 26.  They talk about concatenating

10:07:20 13   within the sandbox package the MPC, which is both the

10:07:23 14   protection code is what we're talking about to the

10:07:26 15   downloadable first followed by the protection policies

10:07:29 16   followed by the downloadable.  There is not attaching it to

10:07:31 17   the end of the downloadable as proposed.  So that is one

10:07:37 18   particular embodiment.  And as Your Honor is aware, you

10:07:40 19   should not read out embodiments unless there is an expressed

10:07:42 20   disavowal to do so.

10:07:44 21        Really, this idea of attaching it to the end

10:07:49 22   comes out, there is not much -- there is no legitimate

10:07:54 23   support for it except as extrinsic definition of append.

10:07:58 24   And that's what Rapid7 relies upon.

10:08:01 25        If you look at extrinsic evidence, you know,

10:08:05 1    which is never the best evidence, there are numerous

10:08:09 2    dictionary definitions that talk about appending just to

10:08:12 3    mean to attach, they scoured the world and found a

10:08:18 4    dictionary definition that says append means attach to the

10:08:20 5    end and that's what they are -- in this particular instance

10:08:25 6    this is a pretty easy one, there is no intrinsic evidence to

10:08:29 7    show that appended should be to the end of the downloadable.

10:08:32 8    There is a preferred embodiment that say it doesn't have to

10:08:35 9    be at the end of the downloadable.  If you look at extrinsic

10:08:38 10   evidence, the vast majority of extrinsic evidence that we

10:08:42 11   could find, append is not attached to the particular

10:08:45 12   location, it's just attaching.

10:08:46 13              Thank you, Your Honor.

10:08:54 14              MR. GAUDET:  Thank you, Your Honor.  I'll be

10:08:56 15   brief.

10:08:59 16              One quick note, their construction is actually

10:09:07 17   even broader than the claim language.  Just downloadable

10:09:10 18   with data attached to it, which would be even broader than

10:09:13 19   the representation --

10:09:15 20              THE COURT:  They don't dispute the

10:09:17 21   representation of the security data, right?

10:09:21 22              MR. GAUDET:  Absolutely.  Thank you.  The

10:09:24 23   fundamental point is appended means appended.  Appended,

10:09:27 24   they didn't say attached, they didn't say insert --

10:09:30 25              THE COURT:  What about all the -- there are

dictionaries that say attached, there are other ones that say attached to the end, and if there is a broad enough interpretation under the ordinary meaning, why isn't it just attach?

MR. GAUDET:  Your Honor, there are not actually technical dictionaries that say just attach.  All the technical dictionaries, they are technical dictionary said append means append.  These literally distinguish prepend with append, and append means place or insert as an attachment by adding data to the end of the file.  All the technical dictionaries bring us all to the end of it.

THE COURT:  So are you saying that append has a special meaning to a person of skill in the art to the '086 patent?

MR. GAUDET:  I'm saying in the context of the person of skill in the art, either the '086 patent or anything, append means -- I say or anything, the '086 patent or any computer, append means at the end, but just like an appendix, if you refer to an appendix, that is something at the end.  So it's not even -- it's not even different than the ordinary meaning.  If I refer to an appendix in a book, you would not see that at the beginning of the book. Likewise a supplement is something that comes after.

And the only other point I wanted to make on this, Your Honor, is his reference to an alleged preferred

10:11:00 1    embodiment, that reference has absolutely nothing to do with

10:11:03 2    this claim.  That's again talking about mobile protection

10:11:07 3    code, it's not about the combination of a downloadable, a

10:11:13 4    downloadable security policy, it's this other thing that

10:11:16 5    these claims aren't directed to at all.  That's all I have.

10:11:22 6             THE COURT:  Okay.  First function, second

10:11:28 7    function.  This one seems to go and be relevant to the other

10:11:37 8    two terms, so I don't know.  I'm not the -- I don't know if

10:11:41 9    it makes sense to do all three here or just do them one by

10:11:45 10   one.  I defer to you.

10:11:49 11            MR. HANNAH:  I was going to say I defer to the

10:11:52 12   Court.  I'm happy to do all three terms or do them one by

10:11:55 13   one.  So I'll just give a quick overview of the '154 patent.

10:12:05 14   The '154 patent is a little bit of a different animal in

10:12:10 15   terms of the DSP patents.  I call this the security computer

10:12:15 16   patent.  I refer to the '494 and the '086 as kind of the DSP

10:12:20 17   patent that downloadable security profile because they

10:12:22 18   generate the DSP.

10:12:24 19            THE COURT:  Though from what we're not sure.

10:12:29 20            MR. HANNAH:  There you go.  This Court will

10:12:30 21   determine, I'm sure.  I call it the DSP patents and they are

10:12:36 22   downloadable.  And the '154 patent is called the security

10:12:38 23   computer patents because it leverages a security computer

10:12:42 24   and found throughout the claims.

10:12:44 25            The way the claim is written is that it's a

content processor that receives content, the content
includes a call for a first function and that call also
includes an input.  And then what happens is that input
is -- I'm kind of -- I'm just going to go and kind of how
the flow goes, but the input is sent to a security computer
to determine if it's safe and if it is determined to be safe
then a second function is allowed to be invoked with the
input.  That's kind of the way the flow goes.  It breaks it
up into components because it is a system claim, but that's
kind of the way the flow goes.

        I think what's important to note here is that
the '154 patent is a broadening continuation of the '289.
So the '289 was the first filed patent in this family.  And
that is the one that requires a very specific embodiment in
which a gateway modifies content, substitutes functions,
puts in -- substitutes a first function, you know, with an
original function and just does all the, essentially the
limitations that the defendants are trying to put into this
claim.  This was a broadening continuation, it removed those
elements and it focused on what the novelty aspect of it
which is transmitting this input to a security computer,
kind of offloading the processing in order to see -- to make
a determination whether they're safe to invoke the input.

        So if I go to the first function/second
function, we say it's a plain and ordinary meaning, the

first function and second function --

        THE COURT:  I get it.  I know what the issue is.
Explain to me why the first function and the second function
can be the same thing.

        MR. HANNAH:  Sure.  So that comes down to just,
you know, we have to kind of get into the weeds here, and so
the first function/second function I believe have to be --
there has to be a first function that's different than a
second function.  But when I say they can be the same
function, for instance, as shown here, you can have a
document.write, that can be your first function.  Once that
input is checked and it comes back, a second function could
be document.write that is invoked in order to execute that
input.

        So we just want to make clear here while we're
not going to come back and say it's the first function first
function, there is a first function and there is a second
function.  When you go down to the programing level, they
can be the same function in terms of the document.write as
an example.

        There are other examples that are kind of known
in the art like eval or other different type of functions
that can be executed that they could be within.  So when you
get into the argument and when you review the papers you see
this whole thing about the nested functions, again, that

10:15:44 1     could be a document.write calling another document.write or

10:15:49 2     something of that nature and when the input gets evaluating

10:15:52 3     the second function could also be the document.write that

10:15:56 4     could be nested that that's allowed to execute.

10:15:59 5            Does that make sense?

10:16:01 6            THE COURT:  No.  You have got to say that again.

10:16:03 7            MR. HANNAH:  So what we're trying to -- what

10:16:10 8     we're trying to set forth and trying to explain is that when

10:16:13 9     you have a first function and a second function, you do have

10:16:16 10     to have two functions.  But they can both be, for instance,

10:16:22 11     document.write, or eval, or they can be program --

10:16:30 12            THE COURT:  What's the difference?  So I see

10:16:33 13     that you have two things that say document.write, one has

10:16:38 14     some stuff with hello in it in parentheses, one says text.

10:16:43 15     What is the difference, if any, between them?

10:16:46 16            MR. HANNAH:  That's where I'm trying to get

10:16:49 17     down, on a technical level they're the same function but

10:16:52 18     they're going to be treated as different functions because

10:16:55 19     the inputs would be different.

10:16:57 20            THE COURT:  And the output is different?

10:16:59 21            MR. HANNAH:  And the output would be different,

10:17:02 22     correct.  So we're just trying to say that when you get down

10:17:02 23     to the programing language, the first function and the

10:17:02 24     second function could be the same function.  And I mean

10:17:12 25     honestly I don't think that that's the dispute is that it

10:17:17 1     could be document.write and the second function could be

10:17:20 2     document.write.  I think that more the crux of the matter is

10:17:25 3     that they're trying to replace substitute with substitute

10:17:29 4     and original into the claims.  I think that's more the issue

10:17:32 5     because I am very -- I am fine saying that the first

10:17:37 6     function and the second function are -- I mean, we would

10:17:40 7     have to work on the language, but they are going to be say

10:17:44 8     separate functions, but you know, I just don't want to be

10:17:48 9     technically imprecise in saying there are different

10:17:52 10    functions because like I said, when you get into the

10:17:56 11    programing language, they could be the same function at a

10:18:00 12    programing level.

10:18:00 13             So in terms of the substitute and the original

10:18:03 14    function, I think this is more of the issue.  And this is

10:18:09 15    where they're trying to comport the limitations from the

10:18:12 16    '289 into the '154.  When you look at the '289, it

10:18:22 17    specifically talks about -- this is on slide 27, this is on

10:18:27 18    the right-hand side, it talks about this embodiment in which

10:18:32 19    you receive content at a gateway computer, you modify that

10:18:36 20    content by replacing a call, the call to the original

10:18:41 21    function with a corresponding call to a substitute function.

10:18:44 22             So what they're trying to do is take those

10:18:46 23    limitations that are in the '289 and import those into the

10:18:51 24    '154.  And that's where the claim differentiation kicks in

10:18:54 25    and it's not proper to do that because the reason the '154

10:18:58 1   as filed was to be a broadening continuation of the '289 and

10:19:02 2   did not include these limitations.

10:19:07 3          One thing again as I was rereading through the

10:19:10 4   briefing and everything else is that there is really no

10:19:13 5   dispute in terms of function here.  Both parties say that

10:19:17 6   function in terms of these terms does not have to be

10:19:20 7   defined.  It's just that they want to put in the word

10:19:23 8   substitute and original function.  So it really is a

10:19:27 9   straight insert of limitations into the claims.  And they

10:19:31 10  have to find clear disavowal in the prosecution history,

10:19:35 11  particularly with regard to the prosecution history of the

10:19:39 12  '154 patent because it is that broadening continuation, and

10:19:43 13  they can't point to anything, they can't point to anything

10:19:47 14  like that.

10:19:48 15         Numerous courts, this is on slide 25, have found

10:19:51 16  that first and second function, when someone that is skilled

10:19:54 17  in the art is going to understand the word first and someone

10:19:57 18  is going to understand the word second, we have this from

10:20:00 19  the *Proofpoint* court, we have this from the *Bitdefender*

10:20:05 20  court.  Again, this has been raised again and again.

10:20:09 21         A couple of points that I also want to make,

10:20:12 22  they're not in the slides, is so in the briefing they come

10:20:19 23  at me pretty hard in terms of statements that I made in

10:20:24 24  front of the PTAB when I argued for this -- argued for the

10:20:31 25  validity of the '154 patent.  It was actually confirmed at

10:20:35 1    two different IPR's, final written decisions, there are

10:20:40 2    instituted final written decisions issued.  I think it was

10:20:44 3    an unfair characterization of the arguments that I made.

10:20:47 4              They point to one line in the beginning of the

10:20:48 5    transcript and it's in C8, exhibit C8, in which they say

10:20:54 6    that oh, I made an admission that the first function has to

10:20:59 7    be a substitute and the second function has to be the

10:21:02 8    original.  That's not the argument that I made.  And I think

10:21:07 9    that line was taken out of context.  If you look at page 63

10:21:11 10   of C8.

10:21:12 11             THE COURT:  Hold on.  Let me grab it.  Is that

10:21:40 12   the joint appendix?

10:21:42 13             MR. HANNAH:  Yes, it's in joint appendix, it's

10:21:45 14   C8.  I can pull it up, Your Honor, if it will help you out.

10:21:54 15             THE COURT:  For some reason it's not -- got it.

10:22:02 16             MR. HANNAH:  You found it?

10:22:45 17             THE COURT:  So what am I looking at here?

10:22:47 18             MR. HANNAH:  What we're looking at here is this

10:22:49 19   is where I described, you know, we're talking about this

10:22:52 20   PTAB proceeding involved in reference called Ross.  And what

10:22:58 21   happened was their expert, the other side is the one that

10:23:00 22   said this is a substitute function, this is the original

10:23:07 23   function.  And so when I used that language there, and on

10:23:11 24   page 63 I'm very clear, I said, Their expert called it --

10:23:15 25   their expert called it a substitute function.  And I'm

referring to the pseudocode.  I'm saying they call it a
substitute function.  That's how the petition was written.

So when I used the word substitute function, I'm
not saying it because of what I believe, I'm saying -- I'm
trying to rebut the evidence that was presented against us.
That's how their expert called it.  Their expert said this
is the substitute function which corresponds to the first
function.  They said this is the original function that
corresponds to the second function.

When I'm describing it during these proceedings,
I actually explicitly say I'm going to use that example, on
page 64, I'm going to go with that example that they're
using because it becomes very, very difficult to explain, to
rebut evidence if I can't use the language that their expert
is using to try to prove that the '154 is invalid.

And so this notion that I equated or said oh,
this is the appropriate definition is simply, it's just a
mischaracterization.  It never came down to the construction
of the first function being a substitute function, the
second function being an original function.  The issue with
Ross, and if you read through this, and I know it's really
in the weeds, but there wasn't a call to a first function or
a call -- the call to the first function which was missing,
and you'll see this whole thing about Hookscripts, I don't
need to get into that, but I don't ever explicitly say this

10:24:53 1    is the proper construction, I was always referring to what

10:24:57 2    their expert said and how they characterized it.

10:24:59 3          The other point -- and maybe it might make more

10:25:05 4    sense to ping pong back and forth, Your Honor, just because

10:25:08 5    I feel like I have been talking for a while and you might

10:25:11 6    have some other questions.

10:25:12 7          THE COURT:  Sure.

10:25:13 8          MR. HANNAH:  But the other point I did want to

10:25:15 9    raise which is not in our slide is that they in their

10:25:19 10   briefing, they argue that the '154 patent has this language

10:25:23 11   of a present invention, and therefore it's going to be

10:25:26 12   limited to that.  Well, I direct Your Honor to column 7,

10:25:29 13   lines 32 of the '154 patent.  And there it also used the

10:25:34 14   language of a present invention.  There it says this is

10:25:38 15   additionally provided in accordance with the preferred

10:25:41 16   embodiment of the present invention, and then it goes

10:25:44 17   through and it specifically describes the claim or one of

10:25:49 18   the embodiments that would meet the claims of the '154

10:25:52 19   patent.  And it doesn't have any reference to a substitute

10:25:55 20   function, no reference to an original function, it's just to

10:25:58 21   a first function and a second function.

10:26:01 22         And so --

10:26:03 23         THE COURT:  And where are you referring to?

10:26:05 24         MR. HANNAH:  I'm referring to column 7 of the

10:26:08 25   '154 patent, lines 32.  And there it specifically talks

10:26:13 1    about a first function and a second function and there is no

10:26:17 2    requirement that the first function be a substitute and that

10:26:19 3    the second function be an original function.

10:26:26 4             THE COURT:  Okay.

10:26:27 5             MR. HANNAH:  So unless Your Honor has any

10:26:29 6    questions, I'll sit down.

10:26:30 7             THE COURT:  Great.  Thank you.

10:26:33 8             MR. GAUDET:  Your Honor, Mr. Dotson will handle

10:26:36 9    this term and the remaining terms for us.

10:26:39 10            THE COURT:  Okay.  Mr. Dotson.

10:26:50 11            MR. DOTSON:  Good morning, Your Honor.  David

10:26:52 12   Dotson with Duane Morris for Rapid7.

10:26:55 13            I want to start by just addressing a couple of

10:27:03 14   the prosecution history points that Mr. Hannah talked about

10:27:07 15   last because I think that's an important issue.  Let me

10:27:20 16   organize my paperwork here.  I'm going to skip to slide 55

10:27:29 17   which is where some of this language occurs in the slide

10:27:33 18   deck.

10:27:34 19            Mr. Hannah is talking about the '154 patent

10:27:38 20   here.  He wanted you to go to the end and look at some

10:27:41 21   specific portion of his transcript in response to a specific

10:27:44 22   question by the board.  But here he's talking about the '154

10:27:48 23   patent's approach.  The '154 patent talks about a call to a

10:27:52 24   first function.  That's a call to a substitute function.

10:27:56 25   And he further explains --

10:27:58  1          THE COURT:  But are you saying that that's a --

10:28:00  2    are you saying that's a disclaimer, that's a definition?

10:28:04  3    What is it that you're saying that constitutes?

10:28:07  4          MR. DOTSON:  It -- frankly Your Honor, it is the

10:28:11  5    plain language of what this should mean in the view of the

10:28:14  6    specification and he's just explaining it which is what I'm

10:28:16  7    doing as well, but it is a disclaimer as well.

10:28:19  8          THE COURT:  A disclaimer has to be clear and

10:28:22  9    unambiguous.  And what am I to make of the fact that he said

10:28:26 10    that there, but then in other places he was talking about

10:28:29 11    first function and second functions and he didn't specify

10:28:37 12    and it appears he was talking about an argument that he was

10:28:41 13    responding to?

10:28:42 14          MR. DOTSON:  That assumes that, Your Honor, that

10:28:44 15    we accepted his hindsight representation about what his

10:28:48 16    transcript means and what he intended to say.  What you read

10:28:52 17    the transcript, it's not ambiguous.  He doesn't ever say in

10:28:56 18    there, well, the first function and the second function are

10:28:58 19    the same because the patents would have been invalidated.

10:29:00 20    So we have a situation where he's talking about this only in

10:29:02 21    terms of exactly what Rapid7 is proposing, now he wants to

10:29:09 22    stand up here today and say what I really meant was X and Y,

10:29:13 23    and the public has the record.

10:29:14 24          THE COURT:  What about the argument that he made

10:29:16 25    when he says now we got back to the first and second

10:29:19 1   function can be the same, I don't think that he's saying

10:29:21 2   that the inputs or outputs of those functions could be the

10:29:25 3   same, he's saying the fact is it could be a function like

10:29:28 4   the write function, you disagree with that that they could

10:29:33 5   both have the same actual function?

10:29:36 6             MR. DOTSON:  Yes.

10:29:37 7             THE COURT:  Okay.  Tell me why what he showed me

10:29:39 8   in the two tables that isn't correct.

10:29:42 9             MR. DOTSON:  Certainly.  This does get as

10:29:44 10  Mr. Hannah alluded to, this does get into the weeds a little

10:29:48 11  bit.  And I think I got an example here that touched on the

10:29:56 12  very example that Mr. Hannah brought up on the slides.  And

10:29:59 13  this deals with slide 67 of our presentation here.  These

10:30:06 14  are the two tables that he put up.  Finjan sort of assumes

10:30:11 15  that one of these is a substitute function and -- sorry, one

10:30:15 16  of them is a first function, one of them is a second

10:30:18 17  function.  When you read the specification there is no

10:30:21 18  indication or specification of these tables in that respect.

10:30:24 19  And what this shows is Table 2, that is showing us the

10:30:28 20  original content.  The backup, what this invention does is

10:30:34 21  it needs to look at these inputs to a function call, and the

10:30:38 22  problem they're trying to address was you can have an input

10:30:41 23  that you don't know what it is until run time, so when the

10:30:45 24  gateway received this content, it can't determine hey, this

10:30:48 25  is malicious because this input, you got to run it first and

10:30:52 1    call this function before you know what it's going to be.

10:30:55 2            So what the specification said was well, the way

10:30:58 3    we're going to deal with this problem is we're going to go

10:31:03 4    ahead and insert a substitute function, a call to a

10:31:06 5    substitute function in this content that's going to have

10:31:09 6    that same input, then we'll send this on down to the client

10:31:15 7    computer that way the client computer will run the content

10:31:18 8    and the client computer instead of hitting that original

10:31:22 9    call that we don't know if it's a problem or not, it's going

10:31:25 10   to hit that call to the substitute function that we've

10:31:27 11   inserted at the gateway and that substitute function does a

10:31:30 12   very specific thing, it sends our input out that to security

10:31:34 13   computer to be evaluated to determine if it's safe.

10:31:38 14   Ultimately it sends back an indicator if it's safe the

10:31:42 15   client computer can invoke that original function with that

10:31:45 16   input.

10:31:46 17           This is kind of a pseudocode here, that's what's

10:31:49 18   being shown here.  On the left-hand side is that original

10:31:52 19   content that comes into the gateway, you see we have our

10:31:55 20   familiar document.write hello.  Document.write is a standard

10:32:00 21   function that's included in your browser.  All it does is it

10:32:04 22   writes text.

10:32:05 23           So what the specification says is we'll have

10:32:11 24   this content modifier at our gateway, it's going to see that

10:32:15 25   document.write function which is the original function, and

it's going to substitute with a call to the substitute

function which is substitute document.write.

          Then we look at Table 3, now it's showing us

where that's been done.  This is our modify content that

comes down from client advice from the gateway.  You see we

got this definition there of what this function is right

around line 48 defining a substitute function that we then

inserted.  And what that substitute function does is we see

down below highlighted, when the content processor invokes

that substitute function call which is highlighted there in

green, the input is going to be passed to the security

computer for inspection.

          And it's going to return a result from the

security computer and if inspection result is true down at

the bottom section there, column 11, lines 1 through 4, then

we're going to invoke the original function call.  That's

what's shown in this code.  So the first thing we're calling

is a substitute function and only if it's safe.  That's what

that if statement there around line 50 and 51 is, if it's

safe based on what your security computer did then we're

going to invoke our original function which is

document.write.  So the original function underlined this

red in both situations is the same.  And the input is the

same.

          THE COURT:  So in this, what's the original

10:33:38 1    function, document.write; correct?

10:33:42 2              MR. DOTSON:   Correct.

10:33:42 3              THE COURT:   What's the substitute function?

10:33:44 4              MR. DOTSON:   Substitute_document.write, which

10:33:48 5    has that functionality to send this to the security

10:33:51 6    computer.  Document.write doesn't send anything to the

10:33:54 7    security computer, it writes text.

10:33:56 8              I'm going to get to this issue.  Another kind of

10:34:06 9    practical matter, Your Honor, the claim language if we look

10:34:09 10   at slide 42, if they were the same function, the claim

10:34:12 11   language wouldn't make any sense.  The claim would be

10:34:15 12   nonsensical because again, we're going to invoke the second

10:34:19 13   function with the input only if a security computer

10:34:22 14   indicates that's safe.  That's the whole point of this

10:34:25 15   thing, right, we don't want to invoke --

10:34:27 16             THE COURT:   But what I'm missing here, you're

10:34:31 17   saying the function is substitute_document.write, but it's a

10:34:35 18   document.write function.  The original function was a

10:34:38 19   document.write function.  They don't dispute that you could

10:34:42 20   have two different document.write functions.  I think what

10:34:47 21   they don't want you to say is that substitute_document.write

10:34:50 22   is not -- is the same function document.write as the

10:34:52 23   original one.

10:34:58 24             MR. DOTSON:   I don't -- respectfully, Your

10:35:02 25   Honor, I don't think that's what they're saying.  Mr. Hannah

10:35:04 1    stood up here and said that document.write, parentheses,

10:35:07 2    whatever is in the parentheses, that can be both a first

10:35:11 3    function and a second function.  That same thing.  He's not

10:35:13 4    saying substitute_document.write is the same as

10:35:17 5    document.write.

10:35:17 6              THE COURT:  But the document.write that he

10:35:19 7    showed me, go back to your thing with the chart, tables 2

10:35:23 8    and 3, isn't the -- the two things that are underlined in

10:35:36 9    red, one of them is hello, the other is text, so aren't they

10:35:41 10   -- isn't the ultimate output of those inputs going into

10:35:45 11   those different?

10:35:46 12             MR. DOTSON:  No.  And I'll show you why.  It's

10:35:49 13   because -- and I can provide a little more context on how

10:35:52 14   function calls work, but that's the reason.  If you see --

10:35:59 15   this is the input, document.write.  And what we're going to

10:36:03 16   do is try to evaluate that input.  So our substitute

10:36:07 17   function that we insert, it has that same input, we need to

10:36:12 18   send that to security computer.  Where we define that

10:36:15 19   substitute function up here, it takes -- it's a variable

10:36:19 20   call text, so whatever you call that function, whenever you

10:36:22 21   put in these parentheses, which is down here, that comes in

10:36:26 22   as text so when you ultimately run through that code and

10:36:32 23   execute document.write, you're using that text variable

10:36:35 24   which is this, this was passed in so it could be evaluated,

10:36:39 25   sent to the security computer and then ultimately used.

10:36:42 1          THE COURT:  What am I to make of everything that

10:36:44 2   you're showing me here and explaining this to me talks about

10:36:49 3   the substitute, the original and the substitute, which is

10:36:53 4   what you're trying to include.  What if I say, look, they

10:36:58 5   changed the language, they didn't say original and

10:37:01 6   substitute, they said it in other patents, other claims,

10:37:04 7   they didn't say it here, I'm not going to read that in, so

10:37:08 8   then how is this relevant?

10:37:12 9          MR. DOTSON:  We can walk through the

10:37:17 10  specification, Your Honor.

10:37:18 11         THE COURT:  It's your argument, tell me what you

10:37:20 12  think.  If I say I'm not going to change the words, so why

10:37:25 13  is it that we shouldn't just say all you need is a first

10:37:29 14  function and a second function and I'm not reading in all

10:37:32 15  this stuff that you want me to read in?

10:37:35 16         MR. DOTSON:  Your Honor, I think that the

10:37:36 17  primary issue is that if these things are the same, there is

10:37:40 18  no -- there is nothing here, there is no invention here

10:37:43 19  because all we have is some content with a function in it.

10:37:46 20  And we have got the Federal Circuit to take a close look at

10:37:49 21  this and the Federal Circuit explained exactly what this is,

10:37:52 22  and that's the only thing disclosed in the specification.

10:37:55 23         The Federal Circuit said there are four

10:37:57 24  independent claims, that's all of them, they all do the same

10:38:01 25  thing, they all execute a substitute function.  And in the

10:38:05 1    '154 patent, the first function is this inspection step in

10:38:08 2    which the content is assessed for safety.  That's the

10:38:12 3    substitute function.  That's what it does.  It sends our

10:38:14 4    input for inspection so we can figure out whether it's safe.

10:38:17 5           They went on and said the second function is

10:38:20 6    when having been deemed safe, the content is actually run.

10:38:24 7    That's when we're going to run our original function because

10:38:26 8    now we know, okay, the security computer told us that's

10:38:30 9    safe, so we're going to run our original content.

10:38:33 10          That analysis is exactly what our proposal

10:38:36 11   embodies.  And it's the same thing that Judge Freeman said

10:38:40 12   in the *Cisco* case.  And, you know, Mr. Hannah got up here

10:38:43 13   and talked about multiple decisions have decided otherwise

10:38:46 14   and he pointed to the *Bitdefender* --

10:38:49 15          THE COURT:  I know, decisions go both ways in

10:38:52 16   this case, I get it.  And I'm not sure why I should pick one

10:38:56 17   over the other unless it's the Federal Circuit.

10:38:58 18          MR. DOTSON:  I'll tell you the Federal Circuit

10:38:59 19   has weighed in on this.

10:39:01 20          THE COURT:  The Federal Circuit -- I got to tell

10:39:02 21   you, I didn't see the word substitute and second function in

10:39:07 22   what the Federal Circuit said.

10:39:08 23          MR. DOTSON:  They're explaining what this does

10:39:10 24   and when you look at the specification the only things that

10:39:12 25   do this are the original function and the substitute

function.  And I think the reason why I brought up the

*Proofpoint* and *Bitdefender* decision is it was the same

judge, Judge Gilliam, he was asked to revisit his prior

construction, his prior construction was A, before the

Federal Circuit decision, but B, he was not provided with

the prosecution history that Judge Freeman was presented

with that we talked about here where Mr. Hannah said it's

the first function is the substitute function.  And she

noted that.  She said the *Proofpoint* discussion, she noted

it and said they didn't have the benefit of what I had in

the prosecution history that occurred after the fact.

          And Judge Alsup, also in California, looked at

the Federal Circuit, he came to the same conclusion.  He

said the claimed first function clearly involves a

substitute function which sends the contents input to the

security computer for inspection once invoked.

          THE COURT:  Can the second function be

theoretically a function that executes an inspection step in

which the content is assessed for safety?

          MR. DOTSON:  I'm sorry, Your Honor?

          THE COURT:  Can the second function

theoretically be a function that executes an inspection step

in which the content is inspected for safety?

          MR. DOTSON:  That would be nonsensical because

you're only going to invoke the second function if it's safe

to do so.  The first function is what you invoke in order to

make that a threshold issue.  Go back to the claim requiring

you're only going to invoke that second function if it's

safe to do so.  If they're the same function, you're going

to invoke it no matter what, whether it's safe or not

because you would have to invoke the first function to ever

get anything off that security computer, so it doesn't make

any sense.

           And Your Honor, in an effort to abbreviate the

slides, I want to point out here the Federal Circuit's

decision my colleague just pulled up for me does in fact

talk about substitute function.

           THE COURT:  I saw that, it was on the one, it

says --

           MR. DOTSON:  So it is, they are talking about

substitute functions are the ones that are doing this

inspection step, which is exactly what Judge Freeman found

and exactly what Judge Alsup found.

           And I'll touch on a couple of issues that also

weigh on some of these other terms, but the '289 patent,

Mr. Andre talked about the '289 patent, he said the '154 is

a broadening continuation.  Obviously there is no such thing

as a broadening continuation.  There is a continuation and

there is not, but it a provisional application, it wasn't

even a straight continuation, so his characterization there

are, that's an argument, that's some official term from the
Patent Office, oh, these claims by definition are broader.

        And there are differences because the '289
patent as he mentioned talks about modifying content because
the '289 claims are dealing with gateways, you're dealing
with the gateway side of it where you're going to pull some
content in and modify it to enter a substitute function.
The '154 claims are the other side, they are the content
side that receives that modified content from the gateway,
that's what the '154 patent is talking about here as shown
in every figure.  You can directly map it.  It's Figure 2
here, you got a content processor, that's exactly what the
claim requires.  You got a client transmitter that transmits
an input shown at the top of Figure 2, client receiver that
receives an indicator from the security computer shown at
the bottom of Figure 2.

        And you know, you look at the specification, the
only component of the system that invokes functions is the
client device.  So again, these claims in the '154 patent
are talking about the client side.  And I think that's
helpful when you try and understand these claims because
they are a bit confusing.

        One other thing that Mr. Hannah mentioned was, I
should note also, we talked about the PTAB, Mr. Hannah
characterizing his arguments, PTAB has said well, we note

that the first function is the substitute function included

in the modified content.  So that's a conclusion the PTAB

came to as well.

But this idea of recursive functions, Mr. Hannah

brought that up as well, and this is -- you're getting way

down in the weeds now.  The bottom line, the bottom line

here is that's a function call that calls itself, so you

have one document.write function, with the input to that is

another document.write function, that doesn't mean one of

them is a first function and one of them is a second

function.  The specification explains how it works and

basically it's what we just talked about, you just do it

over again.  You get your first one in, you see that you're

going to substitute your document.write function with a

substitute function that gets sent up to the security

computer, the security computer says, oh wait, this input

has another function here, I'm going to institute another

substitute function, send that back down and we do this all

over again until we get on our input, you trace through it,

it takes a lot of the stuff through the process.

The other thing that I wanted to mention was

column 7, Mr. Hannah mentioned column 7 of the '154 patent.

I think he explicitly referenced starting at lines 34.

Because the present invention as he noted does say we're

modifying this content at the gateway computer.  And then he

10:45:52 1    pointed to, he pointed to column 7, and let me just put up

10:46:01 2    the first portion of this so we can compare the two.

10:46:06 3          The present invention operated by replacing

10:46:09 4    original function calls with substitute function calls

10:46:12 5    within the content at a gateway computer prior to it being

10:46:17 6    received at the client computer.  Mr. Hannah points us to 7,

10:46:21 7    column 7, lines 33, but that's talking about a preferred

10:46:25 8    embodiment of the present invention.  First of all, it's not

10:46:27 9    talking about globally, this is the present invention which

10:46:30 10   is what limits the scope of the invention.

10:46:32 11         Moreover, this whole column, all it's doing is

10:46:35 12   restating claim language.  There is no explanation in column

10:46:38 13   7 --

10:46:40 14         THE COURT:  I'm sorry, I'm reading column 4.

10:46:43 15   You got to show me column 7.

10:46:45 16         MR. DOTSON:  I apologize, Your Honor.  Let me

10:46:48 17   put column 7 up here on the screen.  This is what he was

10:46:52 18   referring to saying well there are all kinds of preferred

10:46:55 19   statements about the present invention.  But the statement

10:46:58 20   that he referred to is not talking about the present

10:47:00 21   invention period, it's talking about some preferred

10:47:04 22   embodiment.  So that's different, those are two different

10:47:07 23   things.  When you have a statement --

10:47:08 24         THE COURT:  I get it, but his point was you

10:47:11 25   would be reading out the preferred embodiment, not that he

10:47:14 1    was trying to define it using that.  So respond to that

10:47:19 2    argument, not that I get it, that is different, but why

10:47:23 3    isn't -- how is it that you're not reading out what he's

10:47:29 4    saying?

10:47:30 5              MR. DOTSON:  Because it shows you that he's

10:47:31 6    wrong about what the first function and the second function

10:47:33 7    are.  The present invention, period, told us what it is.

10:47:38 8    He's trying to read that out by pointing to some preferred

10:47:41 9    embodiment that he thinks is somehow broader.  But all this

10:47:45 10   is, all these paragraphs in column 7, they're just restating

10:47:50 11   different aspects of the claim language.  You see it all the

10:47:52 12   time in patents, there is no explanation in the

10:47:55 13   specification that would have any indication that a first

10:47:58 14   function and a second function can be the same thing, much

10:48:02 15   less that there would be a function that -- much less that

10:48:06 16   there would not be a function that transmits an input to the

10:48:10 17   security computer for inspection, because you have to have

10:48:12 18   that, you have to have that step, otherwise this claim

10:48:15 19   doesn't do anything.  So there has got to be a substitute

10:48:19 20   function, and in the context of the claim language when you

10:48:22 21   map the specification, that's what the first function is.

10:48:22 22             So I'm happy if Your Honor has any further

10:48:32 23   questions, I know this is confusing, this can be confusing.

10:48:38 24             THE COURT:  No, I don't.

10:48:40 25             MR. DOTSON:  Okay.

10:48:59 1          MR. HANNAH:  Can I make just one quick point on

10:49:02 2   just rebuttal?

10:49:04 3          THE COURT:  Sure.

10:49:05 4          MR. HANNAH:  Counsel said repeatedly that the

10:49:08 5   '289 doesn't cover the client computer at all.  If we look,

10:49:13 6   this is claim -- this is the '289, so you don't have to just

10:49:19 7   believe me.  Claim 1, modifying the content at the gateway,

10:49:27 8   you transmit the modified content from the gateway to the

10:49:31 9   client.  Then you process the modified content at the client

10:49:34 10  computer.  And then all of these steps are about the client

10:49:39 11  computer.  So this representation that somehow the '289

10:49:43 12  covers the gateway an the '154 covers the client is contrary

10:49:49 13  to exactly what claim 1 says.

10:49:52 14         Claim 1 is talking about a system that for the

10:49:56 15  '289, claim 1 is talking about a system that modifies

10:49:59 16  content at a gateway, substitutes a first function with a

10:50:05 17  substitute function, the original function is substituted as

10:50:09 18  well.  And then it's processed at the client computer.  So I

10:50:16 19  just want to make that point.

10:50:17 20         So if you look at the specification, again,

10:50:19 21  which is the '154 and also the '289, the specific element

10:50:22 22  that they're talking about, they're saying the present

10:50:25 23  invention is doing this, and the citation that I provided

10:50:28 24  tracks the claim language.  The citation they provided

10:50:31 25  actually tracks the claim language of the '289 patent, the

10:50:35 1    parent application.

10:50:36 2              When I say it's a broadening continuation, I

10:50:39 3    think that's a term of art that's kind of known in maybe the

10:50:42 4    patent field, maybe it's not, but to me a broadening

10:50:46 5    continuation means you have a parent application which is

10:50:49 6    narrow, a narrow aspect, you identify what is the novelty of

10:50:54 7    it, then you file a follow-on application, it can be a

10:50:59 8    divisional continuation of it and you remove the elements

10:51:04 9    which are not necessary in order to get the patent.

10:51:06 10             I think this is a good transition into our next

10:51:11 11   element, which is the content processor.  So for the content

10:51:19 12   processor, again we say that it's the plain and ordinary

10:51:22 13   meaning, a processor that processes content.  They try to

10:51:26 14   argue that it's a processor that processes modified content.

10:51:30 15             THE COURT:  Isn't the whole issue here if I say

10:51:32 16   that the two things can't be the same, it would be modified?

10:51:36 17   I mean, their argument seems to be that it's got to be

10:51:41 18   modified because the two are different.

10:51:44 19             MR. HANNAH:  I think that the two can be

10:51:45 20   different, but I don't think you have -- I don't think that

10:51:48 21   the content has to be modified.  Like I said, you can

10:51:50 22   have -- I'm not going to get up here during summary judgment

10:51:54 23   and whatnot and say there is a first function and the second

10:51:56 24   function is really the first function.  I think that the

10:51:58 25   modified, the modified part is what they're trying to say is

10:52:02 1    that essentially importing the gateway limitation into these

10:52:06 2    claims which I just showed you is in claim 1 of the '289,

10:52:09 3    and they're trying to say that it's modifying this content.

10:52:13 4              I think that the clearest evidence that this is

10:52:16 5    not the case, and this goes to my broadening continuation

10:52:19 6    statement, or my characterization, is the prosecution

10:52:23 7    history.  And the prosecution history, the term modified was

10:52:28 8    removed during the prosecution from the claims.  There is

10:52:33 9    not a clear intent to remove a term that should be in the

10:52:39 10   claims.  And then try to reinsert that at the claim

10:52:42 11   construction stage I think is completely inappropriate.

10:52:44 12             I think that's the clearest indication showing

10:52:48 13   what the intent was.  And again, the '289 requires this

10:52:52 14   modified content at the gateway and the whole prosecution

10:52:56 15   history of the '154 says that it doesn't need that, it can

10:53:01 16   be -- it's broader than that, and that's how the '154

10:53:05 17   prosecution history kind of shakes out.  I think that's the

10:53:08 18   clearest.  But again, you know, we have presented that

10:53:15 19   example to the various courts.  They have agreed with me

10:53:18 20   saying that the content processor should be given this plain

10:53:23 21   and ordinary meaning.

10:53:24 22             THE COURT:  But they didn't address the

10:53:26 23   particular issue that the defendants raise here, the

10:53:28 24   modified issue.

10:53:30 25             MR. HANNAH:  Well, it comes in different flavors

10:53:32 1  so people have taken different shots at it.  So at one point

10:53:36 2  people were saying -- different defendants said that it was

10:53:41 3  really governed by 112 paragraph 6, and then we had another

10:53:46 4  argument, another slightly different claim construction, but

10:53:51 5  what you get from this, and when you look at the reasoning,

10:53:53 6  I think the reasoning still applies, is that one of skill in

10:53:57 7  the art is going to know what a content processor is.

10:54:00 8  That's the definition.  And there is no -- again, this kind

10:54:05 9  of comes to a first function, second function, there is no

10:54:08 10 construction offered of a process -- it still has the

10:54:13 11 limitation of a content processor, or our construction a

10:54:16 12 processor that processes content.  They're trying to insert

10:54:20 13 limitations into the claim construction, and specifically

10:54:23 14 that word modified.

10:54:25 15         And so that's what the issue comes down to, it's

10:54:27 16 not a construction issue in terms of whether a processor

10:54:31 17 that processes content needs to be modified, a processor

10:54:34 18 that processes content needs to be defined, we both agreed

10:54:38 19 that's appropriate.  It's whether this limitation of

10:54:41 20 modified should be inserted and where the clear disavowal in

10:54:44 21 the prosecution history to do that, it's not there, it's

10:54:44 22 actually the opposite.  This is a rare -- I'm not going to

10:54:51 23 say a rare case because you see a lot of cases, but this is

10:54:55 24 a case in which the applicant was very clear that modified

10:55:00 25 should not be in the construction.

10:55:02 1          THE COURT:  All right.  You're running out of

10:55:03 2  time so you probably want to not repeat yourself too many

10:55:08 3  times.

10:55:08 4          MR. HANNAH:  I'll try not to, Your Honor.

10:55:10 5  Unless Your Honor has any questions, I'll sit down.

10:55:29 6          THE COURT:  So why doesn't this issue rise or

10:55:32 7  fall with your arguments on the prior ruling about they can

10:55:36 8  or can't be the same?

10:55:37 9          MR. DOTSON:  The issues are substantial overlap,

10:55:43 10  Your Honor.  The logic underlying the *Juniper* order was

10:55:48 11  based in what we saw from the Federal Circuit that I

10:55:50 12  discussed earlier as well as Judge Freeman's discussion and

10:55:55 13  specifications discussion that you got to have exactly what

10:55:59 14  the statement of the present invention is which is you got

10:56:03 15  to modify this content.  Again, that's what the present

10:56:08 16  invention, that's how it operates.  Replaces a function call

10:56:11 17  with a substitute function call, sends it to the client

10:56:15 18  computer.

10:56:19 19          THE COURT:  And why doesn't the fact that they

10:56:21 20  remove modified or they had modified in other claims but not

10:56:25 21  in these suggest that I shouldn't just be reading it in?

10:56:28 22          MR. DOTSON:  Because that rejection, Your Honor,

10:56:30 23  was an antecedent basis.  Here it says content, down here

10:56:35 24  you said modified, you need to fix it.  The way they fixed

10:56:39 25  it was by cutting out modified.  There wasn't a substitute

10:56:44 1    -- a substantive discussion about well, these claims require

10:56:47 2    modified --

10:56:48 3                    THE COURT:  Do you really need that?  They took

10:56:50 4    the word modified out, you want me to put the word modified

10:56:54 5    back in?

10:56:56 6                    MR. DOTSON:   That's because the claims

10:57:02 7    themselves require receiving content that requires a call

10:57:07 8    from the first function, which we know from the present

10:57:09 9    invention and the rest of the specification is something

10:57:11 10   that's been substituted in by the gateway.  Content has been

10:57:16 11   modified and it's received.

10:57:18 12                   And to clarify my point on the '289 patent, Your

10:57:21 13   Honor, my point was not that the '289 patent claims don't at

10:57:25 14   all address the client computer --

10:57:27 15                   THE COURT:  I don't really care, I didn't take

10:57:32 16   that --

10:57:33 17                   MR. DOTSON:   Okay.  Just for what it's worth,

10:57:36 18   every single embodiment, you walk through the spec, you walk

10:57:40 19   through the figures, every single embodiment transmits

10:57:42 20   modified content.  That's all there is, otherwise this won't

10:57:47 21   work.  You can't have a substitute function that does this

10:57:50 22   very specific security functionality by sending an input --

10:57:54 23                   THE COURT:  Let me ask you this.  If I were to

10:57:56 24   say you're right that the first and second function should

10:58:01 25   be defined as you define them, why do you need modified in

10:58:05 1  there?  Wouldn't it by definition be modified?  Why should I

10:58:08 2  read in some other word in there?  Because the content

10:58:12 3  processor would have to do the two things that are listed,

10:58:14 4  right?  So why am I dealing with it?

10:58:17 5          MR. DOTSON:  I would tend to agree, Your Honor,

10:58:19 6  with that sentiment, but we have this exact same

10:58:22 7  construction for first function and second function in the

10:58:25 8  *Cisco* case and we're seeing all kind of creative

10:58:28 9  interpretation of the claim.

10:58:30 10         THE COURT:  You know what, you can deal with

10:58:32 11 this, but I can't deal with any creative interpretation that

10:58:37 12 you're going to have.  It seems to me this one pretty much

10:58:40 13 at least as far as defendants are concerned should rise and

10:58:42 14 fall with the first function and second function, and I

10:58:46 15 don't understand why you don't agree with that.

10:58:48 16         MR. DOTSON:  I think as I said, Your Honor, by

10:58:50 17 enlarging the underlying logic the same, obviously Judge

10:58:55 18 Alsup walked through his analysis which relied in part on

10:58:57 19 the first function and second function construction by Judge

10:59:01 20 Freeman, but also on the Federal Circuit's analysis.  So for

10:59:04 21 some reason we're thinking that the Federal Circuit's

10:59:06 22 analysis didn't adequately address first function and second

10:59:10 23 function, that's also still something that Judge Alsup

10:59:12 24 relied upon in determining that the content processor must

10:59:17 25 receive modified content.  But Your Honor, you're correct,

10:59:20 1    it is a very overlapping analysis.  So that's all I have for

10:59:25 2    you on that.

10:59:26 3            THE COURT:  All right.  We're almost out of time

10:59:30 4    so I need some -- to move it along now.

10:59:38 5            A call to a first function, why is this not

10:59:41 6    relevant and decided with those other ones?  Why is this a

10:59:45 7    separate thing I need to rule on?  Because it seems like

10:59:48 8    every time the other courts dealt with it, they just

10:59:52 9    addressed what's a first function, not really the call, so

10:59:56 10   why do we have this as a separate one?

10:59:58 11           MR. HANNAH:  I'm not sure, Your Honor.  I mean,

11:00:00 12   that's why we provided plain and ordinary meaning.

11:00:04 13           THE COURT:  Let me hear from the defendant,

11:00:06 14   then.  Why is this a separate term -- no, I want to hear

11:00:10 15   from the defendant.  If you don't know what the dispute is,

11:00:13 16   I don't need to hear from you.  Why do we have this when the

11:00:16 17   arguments are really about what is a first function?

11:00:21 18           MR. DOTSON:  Because it is the claim is specific

11:00:23 19   about -- there is a difference between a function and a call

11:00:25 20   to function.  And that's an important distinction and one

11:00:28 21   that's likely to be lost on a jury.  Because what we're

11:00:32 22   doing --

11:00:32 23           THE COURT:  You want me to say a call is a

11:00:34 24   statement or an instruction?

11:00:36 25           MR. DOTSON:  It's a statement or instruction

11:00:38 1   that invokes or executes the function.  That's got to be

11:00:42 2   what's within the received content when it comes to the

11:00:46 3   substitute function.  And that's the only distinction

11:00:49 4   because a jury, it's easy to get confused with what's a

11:00:52 5   function, what's a call to function.  When you trace through

11:00:54 6   the claims, it's important that one is a call to function

11:00:59 7   and one is not.

11:01:00 8            THE COURT:  What he said about a call to a

11:01:02 9   function, is a call a statement or instruction to execute

11:01:08 10  the function?

11:01:11 11           MR. HANNAH:  That's the position that the -- I

11:01:14 12  mean that the board found in the IPR.  But I just -- but

11:01:21 13  again, I don't see the relevance here.  So therefore we

11:01:24 14  didn't think -- we think the construction in that case was

11:01:29 15  for a very specific technical analysis in a technical

11:01:35 16  audience there and that one of skill in the art is going to

11:01:39 17  understand, because what they tried to do and if you read

11:01:41 18  the Federal Circuit decision on this, this is the exhibit,

11:01:46 19  that's in the exhibits, but the final written decision, it

11:01:50 20  addressed the final written decisions of the '154 and there

11:01:55 21  it talks about whether -- it also talks about Ross, but it

11:02:00 22  talks about this call and whether the call is actually

11:02:03 23  within the content and then it had this construction in

11:02:06 24  terms of a statement that causes function to execute.

11:02:11 25           Again, we don't see how this construction is

11:02:15 1      going to necessarily help a jury.  I don't disagree in terms

11:02:20 2      of the technical definition of it if it's adopted exactly as

11:02:25 3      the board found, but again, I don't see how it's necessary

11:02:29 4      or what the relevance is.

11:02:30 5              You know, one point that counsel keeps referring

11:02:35 6      to, you know, the Federal Circuit decision, and again, this

11:02:38 7      kind of repeats, and I see why the court, you know, thought

11:02:42 8      that these all should be lumped together is that -- and Your

11:02:45 9      Honor alluded to this, when the Federal Circuit is talking

11:02:48 10     about the '154 patent, and it talks about these original and

11:02:52 11     substitute functions, it always talks about them in relation

11:02:54 12     to the art.  So for instance on page five, it says in the

11:03:00 13     language of the '154 patent the wrapper function is the

11:03:04 14     first or substitute function and the original or first

11:03:07 15     function is the second function.  They always use first

11:03:10 16     function and second function.  It's only when they talk

11:03:12 17     about the art and how the petitioner references it that they

11:03:15 18     talk about these substitutes and originals.

11:03:17 19             This whole issue with the call, I mean, it

11:03:21 20     didn't come down to that was one of the points that they

11:03:24 21     found in the prior art did not reach was whether the call

11:03:28 22     was actually in there or not.

11:03:30 23             THE COURT:  Shouldn't I use that definition from

11:03:32 24     the PTAB, essentially what the defendants have proposed so

11:03:36 25     that, you know, when they look -- when the jury is looking

11:03:41 1    at prior art here they're looking at it under the same

11:03:46 2    definition that your patent has already been approved of?  I

11:03:51 3    mean, do you oppose -- what if I just say will you agree

11:03:55 4    that we can use what the PTAB says, which is what the

11:03:59 5    defendants said, is that a problem?

11:04:01 6            MR. HANNAH:  It's not a problem as long as the

11:04:02 7    first function and second thing is --

11:04:05 8            THE COURT:  I'm just asking you, can I use the

11:04:07 9    language that the Federal Circuit and the PTAB used, are you

11:04:10 10   really going to dispute that regardless of what I do with

11:04:13 11   the rest of it?

11:04:15 12           MR. HANNAH:  No, I won't dispute it.

11:04:16 13           THE COURT:  All right.  Let's move to the next.

11:04:34 14           New face.

11:04:35 15           MR. FRANKEL:  Good morning, Your Honor.

11:04:36 16           THE COURT:  They gave you almost no time, but do

11:04:38 17   your best.

11:04:39 18           MR. FRANKEL:  I'll try to move through this

11:04:41 19   quickly.  If you would just indulge, step back to give an

11:04:48 20   overview, we're now on the '918 patent.  The purpose of this

11:04:51 21   patent is to deal with the situation where a file is

11:05:01 22   received and it's difficult to look into the file because

11:05:04 23   it's compressed or encrypted in some form.  So the idea is

11:05:06 24   to take a look at it, try and understand what type of file

11:05:11 25   it is, and then based on -- put a post-it on the file that

11:05:19 1    says we're very suspicious of this or less suspicious, and

11:05:25 2    then open it up with a particular user account that makes

11:05:29 3    sense given what you know about the file.  If it comes in

11:05:31 4    and it looks potentially very dangerous, we're going to open

11:05:35 5    it up in the basement, have a security guard open it up very

11:05:40 6    carefully and close all the doors before we open it.  If it

11:05:44 7    looks less suspicious, we can open it up in the office.  The

11:05:48 8    equivalent what it's talking about is that they are

11:05:57 9    different user accounts.  So an admin user account would

11:06:01 10   have the greater access to the call system and a guest

11:06:05 11   account would have the least access.

11:06:07 12          So in our firm, and it's likely the same for the

11:06:11 13   Court, you can log-in from different computers in the

11:06:15 14   building with your user account and access your e-mail and

11:06:18 15   other systems.  But there is a guest log-in that only gives

11:06:21 16   you very limited access to the rest of the system.  And if

11:06:25 17   you need to install new software, you need to have admin, an

11:06:32 18   admin account to do so.  You could go to any different

11:06:36 19   computer and use the different systems.

11:06:42 20          The key is to receive the file, do some kind of

11:06:51 21   inspection, and then determine the appropriate account that

11:07:01 22   can be used to open it, which is referring to the security

11:07:04 23   context, permissions, and then attach that information to

11:07:09 24   the file, then pass it along to the client computer and it's

11:07:13 25   opened in the appropriate way.

So for the three terms, and if it's okay with
the Court, I'll just go through them together.  I think it's
very similar issues.  The dispute for each of these is not
hypothetical.  Rapid7 is trying to read in limitations or
embodiments to narrow each of these claim elements.

The first one is executable wrapper code.  And
if you see from Rapid7's construction, they would say that
it has to be a standalone executable file.  It has to
include appropriate computer account instructions and the
byte address of potentially malicious executable code.
That's a whole lot of limitations to read into the element.

So taking a look at claim 1, we see what's
referred to as code A is the potentially malicious
executable code.  So that's the package that's come in to
the mailroom.

THE COURT:  I understand all your arguments, but
the defendants made an argument in their papers that the
executable wrapper code doesn't just wrap an executable as
you want me to define it, it also has to include information
about the determined computer account name.  And they say
that yeah, they refer to the claims as showing that.  So
what's your response to that?

MR. FRANKEL:  We of course agree that this
account that can be used to open the file has to be
identified.  That's stated in the claim up here, so that's

11:09:05 1    not disputed.

11:09:07 2              THE COURT:  You're just saying it doesn't have

11:09:09 3    to be part of the term, the construction, because it's

11:09:11 4    already part of the claim?

11:09:12 5              MR. FRANKEL:  Correct.  Which is a theme

11:09:14 6    throughout many of these constructions.  But the dispute

11:09:17 7    really goes beyond that into saying that this wrapper code

11:09:23 8    has to be standalone and executable file.  And I think the

11:09:28 9    confusion here that Rapid7 is trying to create with their

11:09:32 10   construction, the term is executable wrapper code, and

11:09:36 11   they're trying to get the Court to say that the wrapper code

11:09:41 12   has to itself be executable.

11:09:43 13             But what executable is referring to, the

11:09:48 14   executable code is code A, that's the suspicious code that's

11:09:52 15   come in.  That's your executable code.  Code B is wrapper

11:09:58 16   code for that executable code and it does not need to itself

11:10:02 17   be executable.  It's sufficient to take that package that's

11:10:08 18   suspicious and put a post-it on it that says this is a

11:10:11 19   really --

11:10:12 20             THE COURT:  How do I know that that's the way --

11:10:15 21   is there something you're relying on in the other intrinsic

11:10:20 22   evidence so I know that executable, it's wrapper code for

11:10:23 23   the executable as opposed to it's executable code, so it

11:10:28 24   would be executable in and of itself?

11:10:31 25             MR. FRANKEL:  The next term, computer account,

11:10:42  1    is the key information that's designated, that's the

11:10:47  2    solution of the patent is to identify the particular

11:10:50  3    computer account.

11:10:52  4              So to accomplish that, it's not necessary for --

11:10:57  5    it's just simply not necessary to make code B executable to

11:11:02  6    perform its function which is to identify this computer

11:11:07  7    account name information.  There is an example --

11:11:10  8              THE COURT:  Again, is that just lawyer argument

11:11:13  9    you're making to me or is there something that you can show

11:11:17 10    me that that's the case?

11:11:22 11              MR. FRANKEL:  Well, I would point to this

11:11:23 12    language right here, it says the present invention makes use

11:11:27 13    of restricted security contexts, and the security contexts

11:11:33 14    is the permissions associated with the computer accounts.

11:11:37 15    And they identify a guest account as one example of that

11:11:40 16    that would have much more restrictive security permissions

11:11:45 17    than administrative account, for example.

11:11:47 18              So what the invention does is it ensures the

11:11:51 19    content is processed within the restricted security context.

11:11:56 20    So it's not -- the invention is not creating some new

11:12:02 21    executable file itself, it's identifying the appropriate

11:12:02 22    computer account.

11:12:08 23              I can put the abstract up which would just say

11:12:12 24    the same thing.

11:12:17 25              THE COURT:  Okay.  For this term, this computer

account, the difference is for logging into the client

computer, that seems like it's already in the claim, so

what's the dispute for that one?

MR. FRANKEL:  The dispute is this, Rapid7 would

say that the computer account has to be for that computer

and that computer only, that particular client computer.  It

can't work for any other client computer.  And that's also a

very narrowed restriction on what the claim is talking

about.  Our position is you can -- just as you can use a

guest account with any client computer within a network

system, that's what the use of computer account is referring

to, it's the permissions that the package would be opened

with.  It says here, it's the security context, that's what

the concept is trying to capture.  It's not that you can

only open the file with one computer and not another

computer --

THE COURT:  Doesn't the language that was added

to the claims say that?  Put claim 1 up of the '918 patent.

Isn't it for logging into the computer, the client computer?

I don't understand.  The claim already requires that, so

what's the dispute?

MR. FRANKEL:  Well, so a file comes in intended

for a particular computer, that's the client computer, and

then an account is identified for that computer to use to

open the file.  That's all that this language is intended to

11:14:02 1    capture.

11:14:03 2              Now, there is a reference --

11:14:06 3              THE COURT:  I'm still not understanding the

11:14:07 4    dispute.  They want to say for logging into a specific

11:14:12 5    client computer.  That is talking about logging into the

11:14:17 6    client computer that's already been addressed.  So what is

11:14:22 7    the problem?  You're saying it can be any guest computer.  I

11:14:28 8    don't understand because their language seems to be the

11:14:30 9    language in the claim.  I don't understand what you're

11:14:32 10   saying.

11:14:34 11             MR. FRANKEL:  Okay.  I understand where the

11:14:35 12   confusion is coming from, and you have to take a close look

11:14:40 13   at the language to really get the distinction.

11:14:43 14             The file comes in for a particular computer and

11:14:47 15   that's the computer that the claim is talking about.

11:14:51 16             THE COURT:  Show me, use the words of the claim.

11:14:54 17   You're talking in generality, but you're not using the words

11:14:59 18   of the claim.

11:15:00 19             MR. FRANKEL:  So you receive content.  It has

11:15:02 20   this executable code A.  It's intended for downloading at a

11:15:08 21   client computer.  So that computer in front of the Court

11:15:12 22   right now --

11:15:14 23             THE COURT:  I know.  I want to download it on my

11:15:16 24   computer, got it.

11:15:18 25             MR. FRANKEL:  So now the client computer has

11:15:21 1    different computer accounts for logging into the computer.

11:15:26 2    That is the one that's receiving the file.  Here is where we

11:15:30 3    reach disagreement.  Rapid7 would say that computer account

11:15:33 4    has to be specific to your computer and your computer only.

11:15:39 5              Now, if the Court can log into this computer,

11:15:41 6    and back in chambers has another computer where you can use

11:15:45 7    the same log-in, our view is that that scenario would be

11:15:48 8    captured by this claim.  Rapid7 is saying it's not, that the

11:15:52 9    account has to be specific to a particular terminal.  And

11:15:57 10   they're seizing on the fact that it says the client

11:16:00 11   computer.  And in the file history, I would like to refer to

11:16:05 12   the language there, there was a distinction made over the

11:16:09 13   prior art.

11:16:09 14             THE COURT:  And that's where they got this

11:16:11 15   specific language?

11:16:13 16             MR. FRANKEL:  Correct.  The prior art reference

11:16:17 17   Ferguson talked about log-ins for a server computer.  This

11:16:22 18   claim is talking about a client computer.  Typical network

11:16:26 19   structure you have --

11:16:27 20             THE COURT:  But it says the patentee was talking

11:16:29 21   about the claims including, presumably, this claim, and said

11:16:36 22   the computer accounts of the claimed invention are user

11:16:38 23   accounts for logging into a specific client computer.  So

11:16:41 24   why isn't -- and distinguishing that from server computers

11:16:47 25   which you're saying the Ferguson referenced.  Why shouldn't

11:16:50 1   I use that language?  Why did you say specific if you didn't

11:16:55 2   mean specific?

11:17:01 3          MR. FRANKEL:  Right.  The key distinction again

11:17:04 4   is that Ferguson was talking about a server, not a client

11:17:08 5   computer.  So this is not a server log-in, it's a log-in

11:17:12 6   that you use to access a particular computer.  It doesn't

11:17:15 7   mean a particular client computer and only that client

11:17:18 8   computer, it means you use it to log into one terminal at a

11:17:23 9   time.  So the underlying language here, the comparison is

11:17:29 10  server computers versus a client computer.

11:17:33 11         THE COURT:  So what does specific mean there?

11:17:37 12         MR. FRANKEL:  It meant one instance.  It didn't

11:17:39 13  mean that instance and only that instance.  I don't know how

11:17:45 14  the court system works, but in our firm, I can use my log-in

11:17:48 15  to access any specific computer, it's not limited to only

11:17:51 16  one computer.  The specification doesn't say anything about

11:17:58 17  the account having to be for one computer and only one

11:18:02 18  computer.  That's not the concept of the invention which is

11:18:06 19  selecting an appropriate security context.

11:18:11 20         And if we look at the examples here, these

11:18:15 21  accounts or system which would be the equivalent of the

11:18:18 22  admin who can log-in and do anything to the system, a

11:18:23 23  restricted user who would have very limited permission and

11:18:30 24  which is one person, those are not the sort of accounts if

11:18:35 25  you had accounts for one computer and one computer only, if

11:18:38  1   your desktop computer at home was not connected to anything

11:18:42  2   else and you're the only person who uses it, you wouldn't

11:18:45  3   have three different accounts, one is a system super user

11:18:49  4   account and a restricted account and your own personal

11:18:53  5   account, that only makes sense in the context where

11:18:55  6   different people can use a terminal at different times.

11:18:58  7          THE COURT:  Tell me, then, let's move to

11:19:00  8   combining.

11:19:07  9          MR. FRANKEL:  So the dispute here, this is yet

11:19:11 10   another example in our view where it's a simple word.

11:19:14 11   Combine means to put two things together.  Rapid7 has

11:19:17 12   proposed a very specific subset of combining which is that

11:19:22 13   the other information is embedded within code B.  They refer

11:19:28 14   to some examples in the specification, but there is nothing

11:19:32 15   in the code itself, there is nothing in the claim that uses

11:19:37 16   that embedding language that they like to read in.  The

11:19:41 17   specification talks about an embedder, but that's not the

11:19:45 18   language that's used in the claim.  It's not necessary to --

11:19:50 19   this is a complete invention that would work without

11:19:55 20   embedding.

11:19:56 21          In other words, to realize the goal of taking a

11:20:00 22   look at the file, you x-ray the package, then you put the

11:20:04 23   post-it on that says this is a big risk or it's a small

11:20:08 24   risk, here is how we're going to open it up.  That works if

11:20:12 25   the code B information is put on top of the code A or

11:20:18 1    connected in some way, it doesn't have to be that the

11:20:22 2    executable file is inserted into code B to realize the goal

11:20:26 3    of the claim.  So it would be importing a limitation from an

11:20:30 4    example in the spec.  And the language itself is just, it's

11:20:39 5    that preferably language showing that it's an option may

11:20:43 6    even be a helpful nice way of doing it, but it's not

11:20:46 7    mandatory.  It's not limiting the scope of the claim.  There

11:20:50 8    is nothing in the intrinsic record that Rapid7 points to.

11:20:53 9              THE COURT:  I got it.  Thanks.

11:20:56 10             MR. FRANKEL:  Thank you.

11:21:12 11             MR. DOTSON:  Your Honor, should I address -- I

11:21:15 12   won't walk through the invention again because I think that

11:21:20 13   has been hashed out and Your Honor understands that.  Unless

11:21:22 14   you have questions, I'm going to jump to the first dispute

11:21:27 15   here, executable wrapper code.  I think Your Honor asked the

11:21:33 16   appropriate question of, you know, we look at Finjan's

11:21:38 17   proposal and it's just code that wraps in executable, but

11:21:42 18   that's not what the claim says.  The claim says it's

11:21:47 19   executable wrapper code, which is the same way that the

11:21:49 20   specification describes it.  The specification says it's a

11:21:52 21   standard executable file.  This has got to be something

11:21:58 22   that's executed on its own, it's not some code fragment.

11:22:02 23             THE COURT:  It says preferably.  Why is that

11:22:04 24   required?

11:22:05 25             MR. DOTSON:  Because the claim language says

11:22:07 1  executable wrapper code so to the extent that's an

11:22:10 2  embodiment, the claim tells us for sure that's what they're

11:22:13 3  claiming here, they didn't just say code.

11:22:15 4          THE COURT:  You didn't just say code executable

11:22:17 5  file, you said standalone executable file.

11:22:20 6          MR. DOTSON:  That's a fair point, Your Honor,

11:22:22 7  but that's the only way that the specification describes

11:22:25 8  this type of wrapper file.

11:22:27 9          THE COURT:  As an embodiment.  And I did take

11:22:30 10  their point that in the papers you just conveniently left

11:22:34 11  out the word preferably and that's probably not the best way

11:22:38 12  to get me to think that you're being forthcoming with me

11:22:42 13  when you do things like that.  I do read patents and they

11:22:45 14  were going to clearly make that response.

11:22:49 15          MR. DOTSON:  I apologize, Your Honor.  Obviously

11:22:51 16  we deal with a pretty tight page limitation with these

11:22:55 17  terms.

11:22:55 18          THE COURT:  That's not a page limitation, that

11:22:57 19  was an effort to obfuscate.  That didn't help, either, that

11:23:01 20  argument.

11:23:02 21          Go ahead.

11:23:02 22          MR. DOTSON:  So I think, Your Honor, that that's

11:23:11 23  the only disclosure in the specification about the

11:23:14 24  standalone executable file, sorry, the executable wrapper

11:23:18 25  code, that's the only way they teach that can be done.  I'm

11:23:21 1    not sure what, frankly what the distinction would be between

11:23:27 2    an executable file and a standalone executable file, but

11:23:31 3    that's the way the specification described it.

11:23:34 4              If we just say that the wrapper code doesn't

11:23:44 5    have to be executable, then we've read executable out of the

11:23:50 6    claim.  The patentee could have just said code, they could

11:23:53 7    have said wrapper code, but they said executable wrapper

11:23:57 8    code.

11:23:57 9              THE COURT:  Why is it necessarily reading it out

11:24:00 10   of the code when it's wrapping the executable?  And we know

11:24:04 11   that it's wrapping the executable I guess part of code A.

11:24:15 12             MR. DOTSON:  Because I think for the same

11:24:17 13   reasons that they could have just said wrapper code that

11:24:20 14   wraps code A, they didn't have to call it executable, and

11:24:23 15   because when we looked at the specification it describes the

11:24:27 16   wrapper code itself as being executable which is what we see

11:24:31 17   there.  The specification is not talking about in terms of

11:24:37 18   wrapped executable and, therefore, it's executable, it's

11:24:40 19   just saying that's what code B is, code B is the executable

11:24:42 20   wrapper code and it's preferably a stand-alone executable

11:24:46 21   file.

11:24:46 22             THE COURT:  Okay.

11:24:50 23             MR. DOTSON:  Moving on to -- I think that was

11:24:52 24   the key issue there.  I mean, the other issue, the

11:24:55 25   specification, this is the way this works, right, it

11:25:03 1     explains how we're going to insert this suspicious code into

11:25:06 2     the wrapper code.  We got to have an address in this

11:25:09 3     executable wrapper code, it's a specific thing and it works

11:25:11 4     in a specific way, otherwise we wouldn't know where to put

11:25:15 5     this potentially malicious code into the wrapper code if we

11:25:18 6     didn't have the byte address, so that's the reasoning for

11:25:21 7     that, that portion of Rapid7's proposal.

11:25:32 8          Now, computer accounts, we'll move on to

11:25:35 9     computer accounts.  Rapid7's proposal is straight from

11:25:38 10    Finjan's mouth.  This is how they overcame prior art.  They

11:25:43 11    could have explained or defined this differently and more

11:25:47 12    narrowly if they thought that was a way to get around the

11:25:50 13    prior art, but they chose to do it this way.  They chose to

11:25:54 14    say that computer accounts are for logging into a specific

11:25:57 15    client computer.

11:25:58 16          THE COURT:  Are you really saying what they

11:26:00 17    suggest that -- so if this thing comes to me that I have to

11:26:03 18    be able to log into this computer and not that computer, is

11:26:07 19    that what specific means in your construction?

11:26:11 20          MR. DOTSON:  Yes.  So the claim, the way the

11:26:15 21    claim is structured, this gateway device that does this

11:26:18 22    wrapping and sending, it knows what accounts are available

11:26:21 23    on the destination.  So it knows what computer accounts have

11:26:26 24    what security context so it can know what to choose.  So it

11:26:30 25    has some information about the destination otherwise it

11:26:33 1    couldn't pick the right account for that destination

11:26:36 2    computer.  So perhaps there is no way that it can be

11:26:39 3    programmed so the destination is a network destination so

11:26:42 4    when you log in back at your office it knows that you have

11:26:46 5    this -- your computer has these various accounts, the

11:26:49 6    specification doesn't talk about that.  What the claim says

11:26:53 7    is we've got to know that we got somebody coming in that's

11:26:59 8    destined for a specific computer, we know what accounts are

11:27:01 9    available on that computer.  We are going to pick that right

11:27:04 10   one and send it down, so those accounts have to be available

11:27:06 11   on your specific computer and that's exactly what the

11:27:10 12   patentee said.

11:27:15 13            THE COURT:  Okay.  Why does combine --

11:27:23 14            MR. DOTSON:  We talked about the wrapper code

11:27:24 15   the way this whole thing works, this wrapper code has an

11:27:28 16   address within it a specific byte address where you would

11:27:32 17   embed this code B or this suspicious code, and that's how

11:27:37 18   the wrapper code works.  And that's what's explained in the

11:27:40 19   specification.  We embed the code that's potentially

11:27:42 20   malicious within the wrapper code.  It's embedded in there.

11:27:48 21   And --

11:27:49 22            THE COURT:  But aren't there places in the

11:27:51 23   specification that just talk about combining the two and

11:27:54 24   don't say embedding?

11:27:57 25            MR. DOTSON:  Off the top of my head, Your Honor,

11:28:00 1    I can't tell you there aren't, but I don't recall that.

11:28:03 2    Maybe they use the word "insert" at some point.

11:28:06 3                    THE COURT:  I'm just looking at, for example,

11:28:08 4    column four where it seems like a bunch of times they talk

11:28:15 5    about code A with executable wrapper code B into combined

11:28:27 6    code C, they don't say anything about how they're doing it.

11:28:31 7                    MR. DOTSON:  They're using the claim language.

11:28:34 8    And so this is --

11:28:35 9                    THE COURT:  So why should I then say requires

11:28:38 10   embedding?

11:28:40 11                   MR. DOTSON:  Because as you noted, Your Honor,

11:28:42 12   they don't say how you do it.  So the only disclosure here

11:28:46 13   that we have that explains how we do it particularly when

11:28:49 14   we're talking about this wrapper code is by embedding it at

11:28:54 15   this byte address.

11:28:55 16                   THE COURT:  Okay.

11:29:04 17                   So thank you for the arguments.  That was

11:29:07 18   helpful.  You have given us some things to think about.  I

11:29:11 19   was going to rule on a couple of these terms, at least

11:29:17 20   today, but I think instead I'm going to take these arguments

11:29:22 21   into consideration and I'll rule at the beginning of the

11:29:26 22   hearing next week.

11:29:28 23                   But before that hearing, I want you to go back

11:29:35 24   and talk and see if you can agree on any of the terms.  I

11:29:41 25   think we had agreement on one today, but as I mentioned

11:29:45 1    earlier, you all spent twenty-five minutes on twenty terms,

11:29:48 2    and given the time that you expect us to put into it, that

11:29:52 3    is really just kind of incredible to me.

11:29:58 4            So there do seem to be issues that can be agreed

11:30:02 5    to, or at least if you don't want to agree, you don't need

11:30:06 6    to fight about them because it doesn't really make any

11:30:10 7    difference.  So you need to go back and talk more and I want

11:30:14 8    the people who are lead counsel and the people who are

11:30:16 9    arguing these issues to be on the call.  And then you can

11:30:19 10   tell me if any progress was made.  And I will see you guys

11:30:24 11   next Wednesday at 9 o'clock.

12            (Court recessed at 11:30 a.m.)

13

14            I hereby certify the foregoing is a true and
accurate transcript from my stenographic notes in the proceeding.

15

16                          /s/ Dale C. Hawkins
                          Official Court Reporter
17                            U.S. District Court

18

19

20

21

22

23

24

25